102 F.3d 12
 31 UCC Rep.Serv.2d 327
 ROSS-SIMONS OF WARWICK, INC., et al., Plaintiffs, Appellees,
v.
BACCARAT, INC., Defendant, Appellant.
 No. 96-1619.
 United States Court of Appeals,
First Circuit.
 Heard Nov. 4, 1996.
Dec. 13, 1996.
 
 Jeffrey A. Oppenheim, with whom Kane Kessler, P.C., John H. Blish, Joseph V. Cavanagh, Jr., Michael W. Carroll, Blish & Cavanagh were on brief, New York City, for appellant.
 Steven E. Snow, with whom Thomas R. Noel and Partridge, Snow & Hahn were on brief, Providence, RI, for appellees.
 Before SELYA, CYR and LYNCH, Circuit Judges.
 SELYA, Circuit Judge.
 
 
 1
 Defendant-appellant Baccarat, Inc. (Baccarat) implores us to dismantle a preliminary injunction that compels it to continue selling its wares to the plaintiffs.[1] Discerning neither error of law nor abuse of discretion, we affirm.I. BACKGROUND
 
 
 2
 We divide our account of the relevant background material into four segments.
 
 
 3
 A. The Commercial Climate.
 
 
 4
 Baccarat is a subsidiary of Compagnie des Cristalleries de Baccarat, a prestigious French lead crystal manufacturer. It is the exclusive distributor in the United States of this aristocratic product line.
 
 
 5
 Ross-Simons sells jewelry, tableware, crystal, and sundry other merchandise from retail stores located in several states. Roughly eighty-five percent of its business, however, is generated through catalog and telemarketing sales. It distributes 45,000,000 catalogs annually and maintains a bustling distribution center in Cranston, Rhode Island. A bridal gift registry comprises an integral part of Ross-Simons' business.[2] The firm acquires approximately 15,000 new registrants annually and has about 30,000 active registrations at any given time. In 1995 Ross-Simons grossed $150,000,000 from all its operations, including $1,000,000 attributable to Baccarat crystal (mostly from catalog sales).
 
 
 6
 Ross-Simons carved its niche as a discount or "off-price" retailer, frequently advertising prices as much as fifty percent below suggested retail prices. Baccarat comes from a different school, having steadfastly resisted discounting and discounters. For many years Baccarat refused to sell its crystal to Ross-Simons. Moreover, when Baccarat became the exclusive American distributor of Haviland Limoges porcelain dinnerware (not a product that Baccarat manufactured), it terminated Ross-Simons as an authorized dealer for that line.
 
 
 7
 Rather than turning the other cheek, Ross-Simons responded by filing an antitrust suit. Its complaint alleged inter alia that Baccarat refused to deal with Ross-Simons due to the latter's proclivity for discount pricing. In November of 1992, the parties entered into a written accord (the 1992 Agreement) that settled their differences.[3] Pursuant to that agreement, the federal district court dismissed the antitrust suit without prejudice.
 
 
 8
 B. The 1992 Agreement.
 
 
 9
 An understanding of the 1992 Agreement is critical to reasoned consideration of the issues on appeal. Baccarat and Ross-Simons styled the pact as an "Agreement of Compromise and Settlement" and stipulated that it would be governed by Rhode Island law. They memorialized it "as a compromise between the parties for the settlement of their claims, differences and causes of action." However, they did not ask the district court either to approve the settlement terms or to enter a decree embodying those terms.
 
 
 10
 By virtue of the 1992 Agreement, Baccarat appointed Ross-Simons as an authorized dealer "entitled to purchase and resell [Baccarat crystal] products at such prices and upon such terms as are available to other authorized dealers." In addition Baccarat agreed "not [to] terminate Ross-Simons' status as an authorized dealer, nor otherwise discriminate against Ross-Simons in any manner, [for its refusal] to adhere to suggested resale prices or due to Ross-Simons' marketing through direct-mail catalogs." The 1992 Agreement contains no durational term, but it specifically provides that its covenants and conditions are not terminable on the basis of changed facts.
 
 
 11
 C. The Proposed Agreement.
 
 
 12
 Ross-Simons sold Baccarat products for three years, without incident, until a series of events shattered the increasingly fragile business relationship. A new management regime took control of Baccarat in 1994 and Jean-Luc Negre became the firm's chief executive officer. Early on, Negre made known his view that it was inappropriate for retailers to discount luxury items. He then reshaped Baccarat's marketing strategy in an attempt, as he put it, to improve the "overall image and prestige ... of [Baccarat's] world-renowned name." Under the revised plan, Baccarat limited the number of retailers to whom it would sell its products and simultaneously introduced a new "Authorized Dealer Program." To retain authorized dealership status in 1996 and beyond, a retailer had to sign a particular form of dealer agreement (the Proposed Agreement) no later than December 15, 1995.
 
 
 13
 Although Baccarat invited Ross-Simons (along with 379 other retailers) to participate in this neoteric program, there was a rub; by its terms the Proposed Agreement prohibits the advertising of Baccarat products in any catalog or other printed medium that promotes at off-prices more than twenty-five percent of the items advertised. In addition, Baccarat reserved the right to determine in its sole discretion "whether an advertising or promotional practice is damaging to the image, prestige and goodwill" of its products. If Baccarat found any such practice offensive, it could terminate the dealership forthwith. Because Ross-Simons (alone among Baccarat's invitees) devotes most of its catalog to discounted items, and because Negre previously had proclaimed that off-pricing was inconsistent with prestige, Ross-Simons viewed the proposal as a "suicide note," asserted that it violated the terms of the 1992 Agreement, and refused to sign. Presumably in anticipation that Baccarat would follow through on its threat of termination, Ross-Simons stockpiled Baccarat products in late 1995. The precaution proved justified, as Baccarat refused to fill Ross-Simons' orders (including 1995 orders previously received but theretofore unfilled) from and after January 1, 1996.
 
 
 14
 D. The Proceedings Below.
 
 
 15
 Ross-Simons sued Baccarat in a Rhode Island state court, claiming breach of contract, breach of an implied covenant of good faith and fair dealing, and tortious interference with advantageous business relationships. Baccarat removed the case to the federal district court. See 28 U.S.C. §§ 1332(a) (diversity jurisdiction), 1441 (permitting removal of cases in which diversity jurisdiction exists). In short order, the district court conducted an evidentiary hearing and granted Ross-Simons' motion to compel Baccarat, pendente lite, to continue to sell products in pursuance of the 1992 Agreement. In its ruling the court predicted that Ross-Simons probably would prevail on the theory that the Proposed Agreement constituted an impermissible attempt by Baccarat to subvert the 1992 Agreement. Relatedly, the court concluded that Ross-Simons would suffer irreparable harm in the absence of mandatory injunctive relief, and conversely, that Baccarat would undergo scant hardship should a preliminary injunction issue. This appeal ensued.[4]
 
 II. ANALYSIS
 
 16
 In the sections that follow, we peruse the checklist applicable to preliminary injunction determinations and then assess how well the district court's order withstands Baccarat's multi-pronged attack.
 
 
 17
 A. The Preliminary Injunction Standard.
 
 
 18
 Over time, we have crafted a four-part framework for use in determining whether the grant or denial of preliminary injunctive relief is appropriate. Under this formulation, trial courts must consider (1) the likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest. See Weaver v. Henderson, 984 F.2d 11, 12 & n. 3 (1st Cir.1993); Narragansett Indian Tribe v. Guilbert, 934 F.2d 4, 5 (1st Cir.1991).
 
 
 19
 An appellate court affords considerable deference to the district court's evaluative judgment of these discrete factors and of their interrelationship. See Anthony v. Sundlun, 952 F.2d 603, 605 n. 2 (1st Cir.1991). Thus, a party who appeals from the issuance of a preliminary injunction bears the considerable burden of demonstrating that the trial court mishandled the four-part framework. See EEOC v. Astra USA, Inc., 94 F.3d 738, 743 (1st Cir.1996). In sum, unless the appellant can show that the lower court misapprehended the law or committed a palpable abuse of discretion, the court of appeals will not intervene. See Narragansett Indian Tribe, 934 F.2d at 5; Independent Oil & Chem. Workers of Quincy, Inc. v. Procter & Gamble Mfg. Co., 864 F.2d 927, 929 (1st Cir.1988). Though mistake of law is a rubric that requires no elaboration, abuse of discretion is a fuzzier concept. That inquiry is case-specific, see Weaver, 984 F.2d at 13; Narragansett Indian Tribe, 934 F.2d at 5-6, and a finding of abuse usually entails proof that the nisi prius court, in making the challenged ruling, ignored pertinent elements deserving significant weight, considered improper criteria, or, though assessing all appropriate and no inappropriate factors, plainly erred in balancing them, see Procter & Gamble, 864 F.2d at 929.
 
 
 20
 We proceed to scrutinize the district court's ruling under this deferential glass. In so doing, we address only the first two rungs of the four-part framework, as Baccarat does not challenge the district court's analysis anent either the third or fourth rung.
 
 
 21
 B. The Likelihood of Success.
 
 
 22
 Likelihood of success is the main bearing wall of the four-factor framework. See Weaver, 984 F.2d at 12; Auburn News Co. v. Providence Journal Co., 659 F.2d 273, 277 (1st Cir.1981), cert. denied, 455 U.S. 921, 102 S.Ct. 1277, 71 L.Ed.2d 461 (1982). Here, Baccarat challenges the district court's assessment of this factor in two respects. We examine each in turn. Before doing so, however, we deem it prudent to remind the reader that, just as the trial court, at the preliminary injunction stage, need not predict the eventual outcome on the merits with absolute assurance, see Narragansett Indian Tribe, 934 F.2d at 6 (cautioning that decisions on preliminary injunction "are to be understood as statements of probable outcomes" only), an appellate court need not conclusively determine the merits of the underlying claims to execute abuse-of-discretion review.
 
 
 23
 1. The Nondiscrimination Clause. As previously mentioned, see supra Part I(B), Baccarat agreed in 1992 not to "discriminate against Ross-Simons in any manner" because of its predilection for off-pricing. The district court relied on this clause in holding that Ross-Simons likely would prevail on its breach of contract claim. However, Baccarat maintains that it terminated Ross-Simons for failing to sign the Proposed Agreement and, in doing so, treated Ross-Simons the same as any other dealer who refused to honor this uniform set of terms. Since the lower court's order requires Baccarat to treat Ross-Simons differently than other dealers--that is, more favorably, by allowing Ross-Simons to buy Baccarat crystal without abiding by the Proposed Agreement's uniform terms--it is the court's order, not Baccarat's conduct, this thesis holds, which contradicts the nondiscrimination clause contained in the 1992 Agreement. This resupinate reasoning stands the nondiscrimination clause on its head and ignores the district court's factual findings.
 
 
 24
 Judge Boyle found that of the 380 retailers whom Baccarat invited to become authorized dealers, only one of them--Ross-Simons--engaged in systematic off-pricing. Thus, while the proscription against widespread discounting was part and parcel of a uniform contract (i.e., the Proposed Agreement), only Ross-Simons would feel its sting. Building on this foundation the judge drew the eminently reasonable inference that Baccarat (which had not previously attempted to impose a monolithic set of dealer agreements) wrote these particular provisions in a deliberate effort to circumvent the 1992 Agreement. On this basis, he concluded that Ross-Simons probably would succeed on the merits inasmuch as the proscription violated the nondiscrimination clause.[5]
 
 
 25
 To be sure, these findings are not inevitable, but they reflect a plausible rendition of the evidence then before the court. The findings, in turn, support the court's chain of reasoning and give meaningful effect to the 1992 Agreement's nondiscrimination clause. That ends the matter: at this preliminary stage, it is both the trial court's prerogative and its duty "to assess the facts, draw whatever reasonable inferences it might favor, and decide the likely ramifications." Procter & Gamble, 864 F.2d at 933.
 
 
 26
 2. The Uniform Commercial Code. In its next foray Baccarat attempts to characterize the 1992 Agreement as a contract for the sale of goods, thus bringing into play Article Two of the Uniform Commercial Code (UCC), R.I. Gen. Laws §§ 6A-2-101 to 6A-2-725 (1992), and, in particular, R.I. Gen. Laws § 6A-2-309(2) ("Where the contract provides for successive performances but is indefinite in duration it is valid for a reasonable time, but unless otherwise agreed may be terminated at any time by either party."). In Baccarat's view, this statute renders the 1992 Agreement terminable at will and thus undermines Ross-Simons' contract claims. This argument, though burnished with considerable care, builds on a false premise.
 
 
 27
 We begin with bedrock. Courts look to the apparent intentions of the contracting parties when interpreting contracts. See United States v. Seckinger, 397 U.S. 203, 212 n. 17, 90 S.Ct. 880, 886 n. 17, 25 L.Ed.2d 224 (1970); McCarthy v. Azure, 22 F.3d 351, 355 (1st Cir.1994); Fashion House, Inc. v. K mart Corp., 892 F.2d 1076, 1084 (1st Cir.1989); Johnson v. Western Nat'l Life Ins. Co., 641 A.2d 47, 48 (R.I.1994). A valid settlement agreement is an enforceable contract subject to this basic principle of construction. See ITT Corp. v. LTX Corp., 926 F.2d 1258, 1266-67 (1st Cir.1991); Mathewson Corp. v. Allied Marine Indus., Inc., 827 F.2d 850, 856 (1st Cir.1987); T & T Mfg. Co. v. A.T. Cross Co., 587 F.2d 533, 537 (1st Cir.1978), cert. denied, 441 U.S. 908, 99 S.Ct. 2000, 60 L.Ed.2d 377 (1979); cf. Langton v. Johnston, 928 F.2d 1206, 1221 (1st Cir.1991) (stating that consent decrees between private parties in a commercial setting are treated as contracts). Thus, whether Article Two applies to the 1992 Agreement hinges primarily on the parties' intentions.
 
 
 28
 The district court eschewed any reference to the statute, apparently convinced that it did not govern the 1992 Agreement. We believe that this action is supportable. Article Two does not purport to regulate nonsale transactions. See R.I. Gen. Laws § 6A-2-102. Furthermore, if a contract contains a blend of sale and nonsale elements, Article Two applies only if the dominant purpose behind the contract reflects a sales transaction. See ITT, 926 F.2d at 1266; Cianbro Corp. v. Curran-Lavoie, Inc., 814 F.2d 7, 13-14 (1st Cir.1987); Bonebrake v. Cox, 499 F.2d 951, 960 (8th Cir.1974); see generally 1 J. White & R. Summers, Uniform Commercial Code § 1-1 (4th ed.1995). Consequently, Article Two is not in play if the dominant purpose of an agreement is to settle litigation. See, e.g., ITT, 926 F.2d at 1266; New Eng. Power Co. v. Riley Stoker Corp., 20 Mass.App.Ct. 25, 477 N.E.2d 1054, 1060-61, review denied, 395 Mass. 1103, 481 N.E.2d 197 (1985).
 
 
 29
 While it is not necessary definitively to decide the issue of predominant purpose at this stage in the proceedings, the record strongly suggests that the parties to the 1992 Agreement intended first and foremost to settle the antitrust litigation. For one thing, the title of the pact--"Agreement of Compromise and Settlement"--is a good barometer of the parties' intentions. Though the label that contracting parties affix to an agreement is not necessarily determinative of the agreement's predominant purpose, it can constitute potent evidence of that purpose. See, e.g., Triangle Underwriters, Inc. v. Honeywell, Inc., 604 F.2d 737, 742-43 (2d Cir.1979) (holding a hybrid contract entitled "Agreement for the Sale of [Goods]" to be precisely that); Riley Stoker, 477 N.E.2d at 1060-61 (declining to characterize a document labelled "Settlement Agreement" as a contract for the sale of goods).
 
 
 30
 For another thing, the body of the 1992 Agreement contains language that is more consistent with the purpose suggested by its title than with any other purpose. The agreement opens with a declaration that it represents "a compromise between the parties for the settlement of their claims, differences and causes of action with respect to the dispute." A later section reiterates that the parties executed the document "for the sole purpose of compromising and settling the matters involved in [the antitrust] dispute." (Emphasis supplied). These excerpts comprise powerful evidence that the primary impetus for the agreement was to abate the pending litigation.
 
 
 31
 Baccarat tries to throw cold water on this proposition. Since the antitrust suit was dismissed without prejudice, Baccarat suggests that Ross-Simons could have revived the claims at any time, and, thus, the predominant purpose of the 1992 Agreement must have been the sale of goods. We think that this is a classic non sequitur. Dismissing a lawsuit, even without prejudice, is not an idle matter; it has consequences in terms of costs, legal expenses, time bars, and the like. Because the parties' intentions (and, therefore, the contract's meaning) must be gleaned from all the surrounding circumstances, see, e.g., Seckinger, 397 U.S. at 212 n. 17, 90 S.Ct. at 886 n. 17, the dismissal without prejudice, by itself, cannot support Baccarat's characterization.
 
 
 32
 There is a second problem with Baccarat's attempt to invoke Article Two: even this scant record indicates that the parties never intended the 1992 Agreement to be terminable at will. Indeed, the parties must have understood that the 1992 Agreement would operate at some length because they specifically provided in section four that each party assumed the risk of changes in the operative facts and relinquished any right to terminate the agreement on the basis of such factual shifts. This proviso would be nonsensical if either party had the right to terminate the agreement at will.
 
 
 33
 Raw logic bolsters this evidence. In exchange for the covenants contained in the 1992 Agreement, Ross-Simons surrendered the opportunity to pursue colorable antitrust claims against Baccarat. A reasonable factfinder easily could conclude that Ross-Simons would not have abandoned such an opportunity in exchange for a settlement that, in Judge Boyle's phrase, Baccarat could have ripped up the next morning. Based on the parties' intent, made manifest by the language of the 1992 Agreement and the circumstances of the settlement itself, it seems quite likely that the Agreement was not meant to be terminable at will.
 
 
 34
 We have said enough on this score. For the reasons we have enumerated, the lower court's four major actions in respect to this issue--namely, its refusal to apply Article Two, its determination that the terms of the 1992 Agreement remain in effect, its interpretation of those terms, and its conclusion that Ross-Simons had demonstrated a significant likelihood of success on the merits of its contract claims--are impervious to Baccarat's assault.
 
 
 35
 C. Irreparable Harm.
 
 
 36
 Civil Rule 65(a), as interpreted in this circuit, places the burden of demonstrating that a denial of interim injunctive relief would cause irreparable harm squarely upon the movant. See Narragansett Indian Tribe, 934 F.2d at 6. Baccarat questions whether Ross-Simons carried this burden.
 
 
 37
 The burden is substantial, but it is possible to overstate its dimensions. Baccarat falls into this trap by insisting that, since Baccarat crystal comprises less than one percent of Ross-Simons' total annual sales, there can be no irreparable harm because withholding the line could not jeopardize Ross-Simons' economic viability. To establish irreparable harm, however, a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business. See General Leaseways, Inc. v. National Truck Leasing Ass'n, 744 F.2d 588, 591 (7th Cir.1984). It is usually enough if the plaintiff shows that its legal remedies are inadequate. See Weinberger v. Romero-Barcelo, 456 U.S. 305, 312, 102 S.Ct. 1798, 1803, 72 L.Ed.2d 91 (1982) (collecting cases); Lopez v. Garriga, 917 F.2d 63, 68 (1st Cir.1990). If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel. See, e.g., Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co., 22 F.3d 546, 551 (4th Cir.1994); K-Mart Corp. v. Oriental Plaza, Inc., 875 F.2d 907, 915 (1st Cir.1989); Danielson v. Local 275, Laborers Int'l Union, 479 F.2d 1033, 1037 (2d Cir.1973). Thus, a cognizable threat of such harm can support a restraining order.
 
 
 38
 Even so, whether Ross-Simons made the requisite showing in this case poses a close question. Although there is no mechanical test that permits a court to make an exact calculation of the quantum of hard-to-measure harm that will suffice to justify interim injunctive relief, there are some relevant guideposts. In the first place, the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm. See Narragansett Indian Tribe, 934 F.2d at 6-7; Public Serv. Co. v. Town of W. Newbury, 835 F.2d 380, 383 (1st Cir.1987). In the second place, an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem. See Astra USA, 94 F.3d at 743 (explaining that the greater the likelihood of merits success, the less that is required in the way of irreparable harm); Gately v. Commonwealth of Mass., 2 F.3d 1221, 1232 (1st Cir.1993) (noting the same phenomenon and suggesting that irreparable harm is subject to a "sliding scale" analysis), cert. denied, 511 U.S. 1082, 114 S.Ct. 1832, 128 L.Ed.2d 461 (1994). Finally, it is clear that battles over the quality and quantity of the harm alleged most often will be won or lost in the trial court. See K-Mart, 875 F.2d at 915 ("District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief.") (citation and internal quotation marks omitted).
 
 
 39
 In this instance the district court determined that Ross-Simons made the requisite showing because, absent a restraining order, it would lose incalculable revenues and sustain harm to its goodwill. The court grounded this determination on two factual findings. First, due to the uniqueness of Baccarat crystal, Ross-Simons could not simply replace the Baccarat line with some other brand, and, without the availability of Baccarat, its bridal registry business would suffer. The resultant damage, including lost sales of other registry items, alienation of future registrants, and harm to its reputation, would defy accurate quantification. Second, when Baccarat ceased filling Ross-Simons' orders, Ross-Simons already had printed and distributed millions of copies of its 1996 catalog,[6] and that catalog held Ross-Simons out as an authorized purveyor of Baccarat crystal. The court found that the inability to supply products as advertised would wreak substantial (but immeasurable) damage to the goodwill that Ross-Simons painstakingly had created over the years. The court dismissed Baccarat's counter-argument that Ross-Simons' stockpiling of Baccarat crystal safeguarded it from this type of harm, finding that Ross-Simons would deplete its beefed-up inventory well before the litigation ended.
 
 
 40
 Like the district court, we think that Ross-Simons' bridal registry business is the focal point of irreparable harm in this case. Similar to full-line distributors who hawk "one-stop shopping" as a means of meeting all their customers' needs, Ross-Simons promotes its bridal registry as offering a complete line of giftware, including many choices of crystal. Although not among Ross-Simons' best-selling lines, Baccarat crystal is a prestigious item--a unique, top-shelf line that boasts considerable allure and that is capable of serving as a beacon to attract potential customers. In the context of a bridal registry, as in a variety of other commercial settings, the availability of a product line is as important, if not more important, than the amount of sales generated. See, e.g., Supermarket Servs., Inc. v. Hartz Mountain Corp., 382 F.Supp. 1248, 1256 (S.D.N.Y.1974) (noting the importance of offering a particular brand lest customers go elsewhere). Potential registrants, unable to include Baccarat crystal among their selections, may choose not to register at all with Ross-Simons, enlisting instead with a competitor who offers the full spectrum of desired products.
 
 
 41
 To be sure, the district court's findings anent the bridal registry rest on a number of assumptions about Ross-Simons' business, its customers' attitudes, and the way in which the marketplace operates. But the assumptions are reasonable and are consistent with the available evidence; thus, the court's subsidiary findings are not unduly speculative. These subsidiary findings, in turn, are enough to bottom the court's ultimate finding of irreparable injury. After all, if the court's subsidiary findings are correct, it could never be shown how many brides opted not to associate themselves with Ross-Simons because Baccarat products were unavailable, and it would follow inexorably that neither the adverse impact on sales nor the concomitant insult to goodwill could be measured accurately.[7] See Interphoto Corp. v. Minolta Corp., 417 F.2d 621, 622 (2d Cir.1969) (per curiam); Supermarket Servs., 382 F.Supp. at 1256-57.
 
 
 42
 This is far from an aberrational result. By its very nature injury to goodwill and reputation is not easily measured or fully compensable in damages. Accordingly, this kind of harm is often held to be irreparable. See, e.g., K-Mart, 875 F.2d at 915; Camel Hair & Cashmere Inst. of Am., Inc. v. Associated Dry Goods Corp., 799 F.2d 6, 14-15 (1st Cir.1986). Of particular interest for purposes of this appeal, several courts have recognized that the loss of a prestigious brand or product line may create a threat of irreparable injury if it is likely that customers (or prospective customers) will turn to competitors who do not labor under the same handicap. See, e.g., Multi-Channel TV, 22 F.3d at 552; Jacobson & Co. v. Armstrong Cork Co., 548 F.2d 438, 444-45 (2d Cir.1977); Bergen Drug Co. v. Parke, Davis & Co., 307 F.2d 725, 728 (3d Cir.1962); Hendricks Music Co. v. Steinway, Inc., 689 F.Supp. 1501, 1512 (N.D.Ill.1988); Supermarket Servs., 382 F.Supp. at 1256-57; see also Automatic Radio Mfg. Co. v. Ford Motor Co., 390 F.2d 113, 116-17 (1st Cir.) (suggesting in dictum that irreparable harm to a retailer's goodwill may result from an inability to supply a full line of products), cert. denied, 391 U.S. 914, 88 S.Ct. 1807, 20 L.Ed.2d 653 (1968); Leone v. Town of New Shoreham, 534 A.2d 871, 874 (R.I.1987) (holding that loss of goodwill due to inability to serve returning customers constitutes irreparable harm).
 
 
 43
 Baccarat's other arguments regarding the nature and degree of the harm that Ross-Simons alleges do not require comment.[8] Mindful of the preliminary stage of the proceedings, the strong likelihood that Ross-Simons will prevail on the merits, and the trial court's broad discretion, we uphold the finding that Ross-Simons faced irremediable harm if interim injunctive relief were withheld.
 
 III. CONCLUSION
 
 44
 We need go no further. Here, the district court applied the traditional four-part framework to the evidence before it. In doing so, the court mulled all the appropriate criteria, eschewed reliance on inappropriate criteria, weighed the relevant factors with considerable care, and determined that Ross-Simons made a sufficient showing to justify the issuance of an injunction pendente lite. Given the case-specific factual findings that anchor this determination, we cannot say that the court's action constituted an abuse of discretion.
 
 
 45
 Affirmed.
 
 
 
 [1]
 Ross-Simons, Inc., Ross-Simons of Warwick, Inc., Ross-Simons of Barrington, Inc., Ross-Simons of Atlanta, L.L.C. and Ross-Simons of North Carolina, L.L.C. are all named plaintiffs herein. For simplicity's sake we refer to them collectively as "Ross-Simons."
 
 
 [2]
 The mechanics of a bridal gift registry are uncomplicated. In its simplest iteration, betrothed couples select items that they would like to possess and "register" with a merchant who carries those items. Persons who wish to give wedding presents or gifts for other occasions can then contact the merchant, choose an item from the list, and have it delivered to the registrant(s)
 
 
 [3]
 In addition to Baccarat, other named defendants were parties to both the lawsuit and the settlement. Their involvement does not affect this appeal
 
 
 [4]
 Baccarat's endeavors to secure a stay were unavailing, and the preliminary injunction is in force
 
 
 [5]
 Among other things, Baccarat's former president (who signed the 1992 Agreement on its behalf) executed an affidavit supporting Ross-Simons' view of the nondiscrimination clause. This testimony buttresses the district court's application of the clause
 
 
 [6]
 Following its usual praxis, Ross-Simons prepared its 1996 catalog in the fall of 1995 and began mailing it later that year. The catalog identifies Ross-Simons as an authorized Baccarat dealer and contains a listing of available Baccarat products
 
 
 [7]
 While the district court's finding of irreparable harm is sustainable on this basis alone, the fact that the 1996 catalogs already were in circulation when the contretemps arose increases the threat to Ross-Simons' goodwill. Absent an injunction, catalog recipients might place orders for Baccarat products, believing that Ross-Simons could supply advertised items, and then be disappointed. The harm to Ross-Simons' general goodwill stemming from its inability to fill such orders likewise would be incalculable, and, thus, irreparable. See, e.g., Blackwelder Furniture Co. v. Seilig Mfg. Co., 550 F.2d 189, 196-97 (4th Cir.1977); Bascom Food Prods. Corp. v. Reese Finer Foods, Inc., 715 F.Supp. 616, 637-38 (D.N.J.1989) (collecting cases); Robinson v. United States Postal Serv., 573 F.Supp. 244, 245 (D.Mass.1983); see also Hypertherm, Inc. v. Precision Prods., Inc., 832 F.2d 697, 700 (1st Cir.1987) (holding that substantial damage to business reputation is a sufficient showing of irreparable harm to justify preliminary injunctive relief)
 
 
 [8]
 For example, Baccarat suggests that Ross-Simons could--and still can--avoid any harm simply by signing the Proposed Agreement. This is sheer persiflage. The law--much less a court of equity--should not compel a litigant to sign away the farm in order to save the crops