VIEQUES CONSERVATION AND
HISTORICAL TRUST, et al.,
Plaintiffs

v.

George W. BUSH, President of the
United States of America, et
al., Defendants

No. CIV. 00–1578(PG).

United States District Court,
D. Puerto Rico.

April 25, 2001.

Salvador Tio–Fernandez, Cond. El Dorado, Santurce, PR, Pedro J. Varela–Fernandez, Cayey, PR, Jose J. Nazario–De-La–Rosa, San Juan, PR, for Vieques Conservation and Historical Trust, Union De Viequenses Para La Proteccion Del Medio Ambiente, Stacie Notine, Colleen McNamara, Lucy Garcia, Michael Diaz, Victor Emeric, Jose Ramos–Rivera, Myrna Pagan–Connelly, Jenny Benitez, Judith Conde, Francisco Medina–Maldonado, Ismael Medina, Felix Medina, Jose Alvarado–Cordero, Sergio Garcia–Mojica, plaintiffs.

## OPINION & ORDER

PEREZ–GIMENEZ, District Judge.

The United States Navy ("Navy") announced that it intended to resume inert ordnance training on the island of Vieques sometime after April 27, 2001. In response, Plaintiffs have moved for a Temporary Restraining Order ("TRO") to prevent the Navy from conducting training operations on the island of Vieques. After carefully examining Plaintiffs' contentions the Court **DENIES** Plaintiffs' motion.

### THE EXERCISES

The Navy plans to conduct a "Unit Level Training" exercise at the island of Vieques beginning on or about April 27, 2001, and continuing for four to seven days. "In the exercise, four to ten ships would train in [naval surface fire support] and as many as 150 rounds could be fired per ship, but no more than 300 total rounds would be fired per day. Approximately 35% of the rounds could be fired at night. Additionally, approximately 200 [air to ground] events will be flown and approximately 600 non-explosive bombs will be dropped on the Live Impact Area. As agreed in previous consultations, no illumination rounds will be fired after 11:00 p.m. and total illumination time would not exceed two hours". *Defendants' Opposition to Plaintiffs' Motion for Temporary Restraining Order.*

## THE MOTION FOR A TEMPORARY RESTRAINING ORDER

In support of their motion Plaintiffs make the following arguments: First, Plaintiffs contend that new military exercises would disregard and disobey orders issued by the President of the United States and the Secretary of Defense. According to Plaintiffs, the President of the United States instructed the Secretary of Defense to conduct a study on the health effects suffered by the people of Vieques. As a result of such orders, the Secretary of Defense allegedly "ordered that the military practices in Vieques be stayed until the results of the study were completed". The launching of new military exercises would suppositionally run afoul of this order and warrants the entry of a TRO by this Court.

Second, Plaintiffs make the argument that further military exercises will irreparably injure the residents of Vieques and violate their civil and constitutional rights. Specifically, Plaintiffs claim that if the military exercises are allowed to continue, the people of Vieques will suffer injury in the form of vibroacoustic disease. According to Plaintiffs, the high level of noise produced by sonic booms and shelling during the military exercises will cause injury to the internal organs of the people of Vieques. Plaintiffs have annexed to their motion an Executive Summary addressed to the Governor of Puerto Rico in which three doctors conclude that a group of fisherman from Vieques, when compared to fisherman from Ponce, suffer from certain cardiovascular anomalies not present in the control group.

Plaintiffs further contend that they will be irreparably harmed by the dispersion of "dust particles of uranium" to the areas where the civilian population reside. De-fendants have admitted that uranium rounds were accidentally discharged within the live impact area. According to Plaintiffs, military exercises within the live impact area can raise dust particles of uranium and expose the civilian population to an unsafe level of radiation. Contact with uranium would lead to irreparable injury.

Lastly, Plaintiffs make the argument that if the military exercises are allowed to continue, the environment around the island of Vieques will be irreparably harmed. Specifically, Plaintiffs contend that the military exercises can harm the coral reefs if these come in direct contact with the bombing and/or shelling of the training exercises. Plaintiffs additionally maintain that barrels or drums that have been found in and around two underwater vessels might break if directly hit by any of the inert bombs [1]. Plaintiffs insists that leakage of their contents might lead to an ecological disaster.

## STANDARD OF REVIEW

■ Black letter law in this circuit instructs that district courts ordinarily are to determine the appropriateness of granting or denying a preliminary injunction on the basis of a four factor test. These four factors are: (1) the movant's likelihood of success on the merits; (2) the potential for irreparable harm if the injunction is denied; (3) a balancing of the relevant equities, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no restraining order issues and (4) the effect (if any) of the court's ruling on the public interest. *Starlight Sugar, Inc. v, Soto,* 114 F.3d 330, 331 (1st Cir.1997) (*citing Ross–Simons of Warwick, Inc. v. Baccarat, Inc.* 102 F.3d 12, 15 (1st Cir.1996)); *Sunshine Dev., Inc. v. FDIC,* 33 F.3d 106, 110 (1st Cir.1994) (*cit-*

---

1. The contents of these barrels is presently unknown.

*ing Narragansett Indian Tribe v. Guilbert,* 934 F.2d 4, 5 (1st Cir.1991)).

Likelihood of success is the touchstone of the preliminary injunction inquiry[2]. *Philip Morris v. Harshbarger,* 159 F.3d 670, 674 (1st Cir.1998); *Ross–Simons v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir. 1996) (Stating that likelihood of success is the main bearing wall of the four factor framework). Given this reality, Plaintiffs in argument before the Court, mainly confined its discussion to this subdivision of the test. The Court will run the test giving special attention to the "main bearing wall of the four part test". Nevertheless, the remaining three subdivision remain important. A discussion of all parts of the test follows.

## LIKELIHOOD OF SUCCESS ON THE MERITS

█ Plaintiffs assert that this Court should issue a temporary restraining order because the launching of military exercises would disregard and disobey orders issued by the President of the United States and Secretary of Defense. Nonetheless, a review of the record reveals that Plaintiffs have failed to identify a viable cause of action and/or an applicable waiver of sovereign immunity that would allow them to challenge the authority of the Acting Secretary of the Navy. As with any claim against the United States, the first issue that must be resolved is whether Congress has expressly waived sovereign immunity. Without any reference to an applicable waiver of sovereign immunity, the Court cannot be called to conclude that the United States has waived its immunity. Without a reference to a particular cause of action, the Court is unable to conclude that Plaintiffs can legitimately challenge the authority of the Acting Secretary of the Navy.

█ Even if the Court were to ignore these impediments, Plaintiffs have simply failed to bring forth any evidence that would confirm the existence of the alleged orders. Plaintiffs' argument is a mere conclusion that lacks evidentiary support. Defendants, on the other hand, have brought forth a sworn affidavit from Robert B. Pirie, Jr., the Acting Secretary of the Navy. In the affidavit Secretary Pirie declares, under penalty of perjury, that he has never been "directed by the President or by the Secretary of Defense not to conduct Training at the Vieques inner range, Puerto Rico, pending the outcome of any health study". Given Defendants' evidence and Plaintiffs' lack of it, this Court is unable to conclude that Plaintiffs is likely to succeed on the merits (i.e., demonstrate that future military exercises would violate the orders of the Secretary of Defense).

█ Similarly, Plaintiffs fail to demonstrate that they are likely to succeed on the merits as to the issue of the adverse health effects suffered by the people of Vieques. Plaintiffs' adverse health effects argument fails to identify any specific basis for relief or any specific rights that have been or will be violated. Making the conclusory argument that the Navy's activities on Vieques "constitute violations to Plaintiffs' constitutional and civil rights..." is just not enough. Our constitutional system of government demands that a movant party states its cause of action with specificity and bring forth some convincing evidence to that effect before a Court restrains a party from en-

---

**2.** The standard of review for a temporary restraining order is similar to that for a preliminary injunction. *Merrill Lynch, Pierce,* *Fenner & Smith, Inc. v. Bishop,* 839 F.Supp. 68, 70 (D.Me.1993).

gaging in what is otherwise a lawful activity.

As support for their argument, Plaintiffs rely extensively on a vibroaccustic study performed by medical doctors from the Ponce School of Medicine. Plaintiffs have annexed an executive summary of its findings. The information within the executive summary is simply not enough evidence from which the Court could appraise, to some degree of certainty, that Plaintiffs are likely to prove that their constitutional and civil rights are being violated. In fact, the executive summary itself states that its conclusions are preliminary and that further tests and investigations are necessary. The findings of a preliminary study are just that—*preliminary.* The Court needs more than preliminary findings before it decides to restrain the activities of a party.

The validity of the Ponce findings are further placed into question by the evidence that Defendants have put forth. A review of the executive summary issued by medical doctors from The Johns Hopkins School of Public Health and School of Medicine concludes that:

> Our review of the information on vobroacoustic disease suggests that the existence of this syndrome should not yet be accepted. The evidence to support its existence comes largely from one group of investigators and replication of their work in other populations is needed. As described by the Portuguese researchers, a unifying basis for the multiple manifestations of vibroacoustic disease cannot be readily identified. However, if their work is to be verified, it is important to recognize that the noise levels, duration and wave form characteristic for workers in an aircraft plant would be very different from the noise that is experienced in the community of Vieques. Were the existence of vibroacoustic disease in aircraft workers to be confirmed, additional research would be required to assess its relevance to much lower and more intermittent exposures in communities. *It would be premature to attempt to link the observations in the Portuguese aircraft workers to the Vieques residents.*

*Vieques Vibroacoustic Disease Study— Exhibit F to Defendants' Opposition to Motion for Temporary Restraining Order.* It would be a regrettable error for this Court to grant a restraining order on the basis of a disease whose existence is not yet accepted by a majority of the scientific community [3].

The compatibility of the Portuguese study to the Vieques site and its ability to establish scientific fact is further placed into question by a sworn affidavit issued by William G. Rudolph—a Captain in the Medical Corps of the United States Navy. Captain Rudolph has served on numerous occupational medicine positions, including the department head of the Navy's largest occupational medicine department at Navy's Medical Center in Virginia. He also has extensive experience in the effects of occupational noise exposure. Regarding vibroacoustic disease Capt. Rudolph states as follows:

> Vibroacoustic disease has been proposed by a group of Portuguese researchers, primarily through articles published in a 1999 supplement to the Journal of Aviation, Space and Environmental Medicine. The studies are largely based on a group of workers at a single Portuguese aircraft manufacturing and repair facility. In my opinion, the Portuguese studies have numerous shortcomings which

---

**3.** There may well be a time when Plaintiffs prevail on the merits. However, at this early stage, it is impossible for the Court to find this to be so.

limit the ability to draw conclusions about the existence of vibroacoustic disease. More importantly, these findings have not been reported in other similar work groups. It is extremely important that the findings reported by the Portuguese researchers be replicated in other populations before considering vibroacoustic disease as an acceptable syndrome. There may have been factors unrelated to noise exposure that led to the findings of the Portuguese study group... I am not aware of any literature other than [the Portuguese study] or reports from authoritative sources such as the National Institute for Occupational Safety and Health, the Occupational Safety Health Administration or the Agency for Toxic Substances and Disease Registry that have suggested the syndrome of vibroacoustic disease.

*Rudolph Decl. at p. 2—Exhibit G of Defendants' Opposition to Motion for Temporary Restraining Order.*

The evidence brought forth by Defendants has convinced the Court that, at this stage in the litigation, Plaintiffs have failed to meet their burden. In order for a temporary restraining order to issue, Plaintiffs had to demonstrate, through evidence, that vibroacoustic disease exists and is currently harming the residents of Vieques. Defendants' persuasive evidence to the contrary has clouded the issue to the point that the Court does not believe that Plaintiffs will be able to succeed on the merits.

Likewise, Plaintiffs have failed to show that they are likely to succeed on the issue of whether uranium particles will harm the Viequense population. This issue was discussed at length in the Opinion & Order filed by this Court back on July 3, 2000. In their present motion, Plaintiffs do not bring forth any new arguments or evidence that would sway the Court to change its prior ruling. In instances such as this one a Court should "refrain from writing at length to no other end than to hear its own words resonate". *Cruz–Ramos v. Puerto Rico Sun Oil Co.*, 202 F.3d 381, 383 (1st Cir.2000). Suffice it to say that the Court stands behind its previous ruling on this matter [4].

■ Lastly, Plaintiffs have failed to persuade the Court on the issue of whether military exercises will lead to an ecological disaster. Although Plaintiffs have introduced a reasonable amount of evidence to support their position, Defendants have done exactly the same. Plaintiffs cite a study conducted by James W. Porter a Professor of Ecology and Marine Science from the University of Georgia as evidence that coral reefs will be hurt by the training exercises. Although the study does seem well documented, the study's executive summary states that "A more detailed study of wider scope needs to be conducted before making further conclusions... [5]

---

**4.** See Opinion & Order of July 3, 2000 at p. 5 and 7 where the Court refers to the issue of depleted uranium and states that "Defendant thus presented more than sufficient information to cloud the only issue here: are Plaintiffs likely to succeed on the merits. The answer at this stage must be no... The Nuclear Regulatory Commission ("NRC") has investigated the live impact area where the depleted uranium rounds were discharged. The NRC concluded that there is no danger to the public health at this time. While this does not end the case, it does end the inquiry on this issue. The Court therefore finds that Plaintiffs have failed to show a cognizable threat of irreparable harm."

**5.** The complete sentence reads as follows: "A more detailed study of wider scope needs to be conducted before making further conclusions but our preliminary assessment of the reefs does reveal that many of the reefs on Vieques have been seriously impacted by the military exercises."

". The study itself suggest that further investigation is needed before drawing any final conclusions.

Defendants counter Plaintiffs' evidence by bringing to the Court's attention the sworn declaration of Rhoda F. Hayden, a civilian employee of the United States Navy presently working as the NEPA Program Manager for Commander in Chief, U.S. Atlantic Fleet, based in Norfolk, Virginia. Ms. Hayden has overseen the work of a multi-disciplinary team of environmental experts as they have studied the environmental impacts associated with U.S. Navy training activities on the island of Vieques. In her affidavit, Ms. Hayden states that none of the reefs that were the subject of the study cited by the Plaintiffs will be affected in the upcoming exercises. The water hits during the exercises will all occur to the north side of the island whereas Porters' study concentrated on reefs located at the eastern end of the island.

Ms. Hayden further questions whether the real cause of reef deterioration is rooted on the training exercises. She states that "Given the limitation on naval training activities, the predominant impact on the reefs is mainly attributable to natural influences and commercial exploitation of the land and water resources at Vieques". As to the possibility that other reefs would be directly hit in the upcoming training exercises, Hayden states that realistically only about 8% of the total rounds will come to rest in the coral reefs.

Plaintiffs urge that an ecological disaster might occur if any of the underwater barrels which contain an unknown content are hit by a bomb during the upcoming training exercises. Dr. Porter states that "If the containers hold toxic materials, and if their integrity is breached, then the possibility of both local and regional contamination exist... even these so called green munitions (inert bombs) could become highly dangerous if they were to destroy the fragile integrity of either barrels or gas cylinders". Plaintiffs' Exhibit 4, p. 3. Defendants counter Porter's conclusions through the affidavit of Lieutenant Junior Grade Randall Harmeyer. Lieutenant Harmeyer was assigned to investigate what the sunken ships, around which the barrels are located, could be and what the barrels could contain. From record reviews, interviews, anecdotal discussions, dives review of photographs and video, Lieutenant Harmeyer determined that one of the ships is possibly the USS KILLEN. The KILLEN was decommissioned in the 1960's and was apparently used as target practices during past training exercises. According to Lt. Harmeyer the ship was sunken more than 25 years ago.

Lt. Harmeyer points out that the USS—KILLEN is discussed in a 1983 Memorandum of Agreement between the Commonwealth of Puerto Rico and the Navy. In that memorandum the parties agreed that "the vessel is an important marine habitat and that no action should be taken to remove the remaining hulk because it would be ecologically damaging to attempt to do so. The hulk is not a hazard to navigation, is [sic] being colonized by coral and should be left in place as a marine habitat."

As to the contents of the barrels, Lt. Harmeyer states that the barrels have been the subject of three recent Navy sponsored dives. During each of the dives, Navy officials observed that there was no obvious environmental damage resulting from the presence of the vessels or the drums. That there is substantial sea life around the vessels and that many types of coral and fish are present. The vast majority of the drums are broken and now harbor sea water and sand. Some of

them contain thriving marine communities in them.

As part of his investigation, Lt. Harmeyer conducted some historical research and discovered that barrels (similar to the ones observed near the USS KILLEN) were systematically placed by the Navy on board target ships. The barrels provided target ships with stability, buoyancy and greater ability to absorb impact.

Whether the barrels contain toxic material or whether the training exercises will hurt the coral community around Vieques are questions that cannot be answered at this stage of the litigation. Both Plaintiffs and Defendants have provided the Court with contradictory evidence. What is clear from the record is that more research is necessary before any scientific and hence legally acceptable conclusions can be drawn. Plaintiffs' "likelihood of success on the merits" as to their ecological disaster argument is thus at best questionable. *See Coastal Fuels v. Caribbean Petroleum,* 990 F.2d 25, 26 (1st ·Cir.1993) (Affirming the district court's denial of a temporary restraining order because the likelihood of success on the merits was "at best questionable"). In the face of contradictory scientific evidence this Court cannot conclude that Plaintiffs are more likely than not to succeed on the merits of their claim. Hence, Plaintiffs have failed to carry their burden. The issuance of a temporary restraining order is unwarranted.

## THE POTENTIAL FOR IRREPARABLE INJURY

■ "A federal court must find a cognizable threat of irreparable harm as an essential prerequisite to the issuance of a preliminary injunction." *Ralph v. Lucent Technologies, Inc.,* 135 F.3d 166, 170 (1st Cir.1998) *citing Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 19 (1st

Cir.1996). The above discussion certainly answers the question of whether Plaintiffs have succeeded in showing that the military exercises will lead to irreparable harm: the answer at this stage must be no.

One uniting theme permeates through out all the scientific evidence that has been presented in support and in opposition to the present motion—more research and investigation is needed in order to reach scientifically acceptable conclusions. In the face of often contradictory scientific evidence, this Court cannot conclude that Plaintffs, or the environment around Vieques, will suffer irreparable harm as a consequence of the military exercises.

■ While the potential for irreparable injury does not weigh in favor of Plaintiffs, it does not weigh in favor of Defendants either. Yet, the .Court would breach its pledge to do justice if it were to restrain the Navy's activities basing itself on the conclusions of preliminary studies that are directly contradicted by the evidence brought by Defendants.

Furthermore, Plaintiffs have failed to answer one pressing question: Why, after fifty-eight years of military activity is this bombing going to create irreparable injury to the point that it warrants a temporary restraining order by this Court?

## BALANCING OF THE EQUITIES AND THE EFFECT ON THE PUBLIC INTEREST

■ The equities at issue here favor the Navy, not Plaintiffs. We are living in a time where the relative peace enjoyed by all citizens of the United States is being challenged more and more frequently by our enemies and terrorists alike. Lately, there have been signs of real international tension. If world peace is to be achieved, the United States must continue to be the

driving force of democratic principles. An integral part of world leadership is having a well trained military that is ready to absorb all challenges that may arise. It is thus abundantly clear that "the Court cannot simply zoom in on the concerns of the United States citizens residing in Vieques, but it must pan back and keep the larger picture in focus. This TRO motion implicates not only United States citizens that make their home in Vieques, but ALL United States citizens, citizens who are entitled to a well trained military and national security". *Opinion and Order of June 29, 2000, p. 7.*

Given that the rights of all United States citizens are implicated, the countervailing equitable reasons cited by Plaintiffs are simply not enough to tip the balance in their favor. National security is too important of an issue to be neglected.

### CONCLUSION

Plaintiffs have failed to carry their burden of persuasion. The Court has before it a situation where both parties have bombarded each other with a plethora of scientific studies, sworn statements, counter sworn statements and sub-rebuttal motions. Scientific uncertainty and a high level of public interest leads to only one conclusion: A temporary restraining order is unwarranted.

**IT IS SO ORDERED.**