In re AEROVOX, INC., Debtor.

Aerovox, Inc., Plaintiff,

v.

Parallax Power Components, LLC, Defendant.

Bankruptcy No. 01–14680–JNF.
Adversary No. 02–1222.

United States Bankruptcy Court,
D. Massachusetts.

July 9, 2002.

Charles Bennett, Hanify & King, Boston, MA, for plaintiff.

Michael Goldberg, Hill & Barlow, P.C., Boston, MA, for defendant.

## MEMORANDUM

JOAN N. FEENEY, Bankruptcy Judge.

## I. INTRODUCTION

The matter before the Court for determination is the Motion of the Debtor, Aerovox, Inc. ("Aerovox" or the "Debtor") for Injunction Compelling Specific Performance of Asset Purchase Agreement and Escrow of Disputed Funds (the "Injunction Motion"). The Debtor filed the Injunction Motion in the above-captioned adversary proceeding, which was commenced by the filing of Debtor's Verified Complaint for Specific Performance of Asset Purchase Agreement and for Declaratory Judgment Respecting Adjustments or, in the Alternative, for Liquidated Damages. The Injunction Motion and the Complaint arise out of a dispute over the sale of the Debtor's assets. Through the Injunction Motion, the Debtor requests the Court to order the Defendant, Parallax Power Components, LLC ("Parallax" or the "Buyer"), to close the sale of the Debtor's assets pursuant to an Amended and Restated Asset Purchase Agreement dated April 18, 2002 (the "APA"), which this Court, after a hearing, approved on June 12, 2002. The sale was scheduled to close on June 25, 2002. The Debtor filed its Complaint and the Injunction Motion on June 25, 2002, the same day as the scheduled closing.

The Debtor filed a Motion for an Emergency Hearing in conjunction with the Injunction Motion. The Court granted the Debtor's Motion for an Emergency Hearing based upon the Affidavit of the Debtor's President, Robert Elliott, in which he averred that the Debtor's operations would cease and the estate would sustain substantial injury if the matter were not decided on an emergency basis.

The Court treated the Injunction Motion as a request for a preliminary injunction, and conducted a nonevidentiary hearing on June 27, 2002 and an evidentiary hearing on June 28, 2002. The Court heard testimony from both parties' witnesses and received ten exhibits as documentary evidence. By agreement of counsel to both parties, the Court accepted the Affidavits of Robert E. Richards, Jr., an attorney for Aerovox, and F. Randal Hunt, the Debtor's Chief Financial Officer, with exhibits, in lieu of direct testimony, although both witnesses were examined. On July 2, 2002, the parties submitted Post–Trial Memoranda of Law and the Court took the request for a preliminary injunction under advisement. In accordance with Fed. R.Bankr.P. 7052, the Court now makes the following findings of fact and conclusions of law.

## II. FACTS

### A. *Procedural and Factual Background*

The Debtor filed a voluntary Chapter 11 petition on June 6, 2001 and has operated during the pendency of this case as a debtor in possession. As of the petition date, the Debtor was the largest manufacturer and distributor of electrostatic and aluminum electrolytic capacitors in the world, employing approximately 1,400 people in four locations: New Bedford, Massachusetts; Huntsville, Alabama; Juarez, Mexico; and Mexico City, Mexico. The Debtor also owned a subsidiary in Great Britain.

The Debtor's secured creditors, who are owed collectively the approximate sum of $29,000,000, did not support reorganization of the Debtor. The Debtor's secured creditors filed motions for relief from stay to foreclose on their liens which were the subject of stipulations that provide for the sale of the Debtor's assets. Although the Debtor had filed a plan of reorganization on April 15, 2002, confronted with the implacable opposition of its secured lenders, it withdrew the plan, deciding instead to liquidate the company. The Debtor's secured creditors and its creditors' committee, which represents the interests of the unsecured creditors who are owed approximately $20,000,000, supported the sale of the Debtor's assets.

In June of 2001, shortly after the commencement of the case, the Debtor employed Loeb Partners Corporation ("Loeb") as its investment banker for the purpose of marketing the sale of all of the Debtor's assets. Loeb marketed the assets for approximately twelve months and spoke with approximately eight potential offerors. Loeb, however, was unable to procure an offer from one buyer for all assets.

On April 19, 2002, the Court approved the sale of the Debtor's British subsidiary for the sum of $7,000,000. On June 4, 2002, the Court also approved the sale of the Debtor's Mexico City plant to Nueva Generacion Manufacturas for the sum of $2,550,000. Both sales were successfully consummated.

In late 2001, Parallax, a competitor of the Debtor, became interested in acquiring the Debtor's operations in New Bedford, and its inventory in Mexico. During late 2001 and early 2002, Parallax visited the Debtor's business and investigated its as-

sets, including inventory. Parrallax made an offer to purchase the Debtor's assets on terms unknown to this Court. However, the parties did not reach an agreement on the terms of a sale and negotiations ceased in early January 2002. In the early spring of 2002, however, Parallax and the Debtor entered into a second round of sale negotiations. They entered into the Asset Purchase Agreement ("APA"), which will be more fully discussed below, on April 18, 2002.[1]

Following execution of the APA, the Debtor, on April 26, 2002, filed a Motion to Sell Assets by Private Sale, Free and Clear of Liens, Claims, Encumbrances and Interests, and for Authority to Assume and Assign Certain Executory Contracts and Unexpired Leases (Parallax Power Components) (the "Sale Motion") and a Notice of Private Sale through which it sought approval of the APA and solicited higher offers. The APA was incorporated into a Motion to Sell and Notice of Intended Sale filed with this Court. In the Sale Motion, the Debtor described the terms of the sale as follows: the assets, including inventory, equipment and intellectual property located in New Bedford, and inventory located in Mexico, were to be sold to Parallax for $8,500,000, with $340,000 to be paid as a deposit to be held by Debtor's counsel pursuant to the terms of an Escrow Agreement, and the balance of $8,160,000 to be paid at the closing, subject to adjustment upward or downward to reflect the change in the aggregate book value of the inventory, as set forth in the APA. The original closing date was to be on June 18, 2002; however, the APA was thereafter amended on June 4, 2002 to provide for a closing to be held on June 25, 2002.

In addition to the Motion to Sell, the parties joined in and filed a Motion to Approve Termination Fee and Sale Procedures, which the Court heard on April 30, 2002. Parallax's attorneys attended and participated in the hearing. The Court granted the Sales Procedures Motion and entered an Order dated May 1, 2002 which authorized, among other things, the form of amended notice of sale and a breakup fee in the event Parallax was not successful in buying the assets.

The Court conducted a hearing on the Sale Motion on June 4, 2002. Although the Debtor was unsuccessful in soliciting higher offers, several objections to the proposed sale to Parallax were filed. Both Parallax's and the Debtor's attorneys attended the hearing. Counsel to the Debtor reported that the objections had been resolved by agreement. In addition, he represented that the APA had been amended to permit Parallax, at its option, to extend the closing date to June 25, 2002, providing Parallax informed the Debtor of its decision by noon on June 13, 2002. Counsel to the Debtor also represented on the record that the APA had been amended to reflect the parties' agreement, reached that morning, to permit the Debtor to continue operating its business after the Estimated Closing Inventory Value statement, discussed below, and that another physical count would not be done prior to the closing.

Counsel to the Debtor and counsel to Parallax reported that they had reached agreement on the terms of a proposed

---

1. At all material times in connection with the sale, Parallax and the Debtor have been represented by counsel. Parallax has been represented by attorneys at three law firms: the New York firms of Shiboleth, Yisraeli, Roberts & Zisman, LLP and Kelley, Drye & Warren, LLP, which negotiated the APA and appeared at several court hearings in connection with the sale, and the Boston firm of Hill & Barlow, which represents Parallax in connection with this adversary proceeding.

Order approving the sale. On June 5, 2002, one day after the hearing on the Sale Motion, the parties submitted an agreed Order Pursuant to Sections 105(a), 363 and 365 of the Bankruptcy Code (i) Authorizing the Debtor's Sale of Certain Assets Free and Clear of Liens, Claims and Interests; (ii) Approving the Terms and Conditions of an Asset Purchase Agreement with Parallax Power Components LLC; and (iii) Authorizing the Consummation of the Transactions Contemplated in the Asset Purchase Agreement (Parallax) (the "Order"). No parties in interest objected to the proposed Order, and the Court entered the Order on June 12, 2002. The Order provided for approval of the APA as amended in open court on June 4, 2002.

B. *Pertinent Contractual Provisions*

The APA contains the following provisions pertinent to the instant dispute:

2.5 *Purchase Price; Payment.*

... The Purchase Price shall be paid in cash in United States dollars by the Buyer to the Seller as follows: (i) concurrently with the execution and delivery hereof, a deposit in the amount of $340,000.00 (the **"Deposit"**) shall be deposited into escrow by the Buyer pursuant to the terms of the Escrow Agreement (as defined below); and (ii) at the Closing, the sum of $8,160,000.00, *but less* an amount equal to all interest earned on the Deposit, by wire transfer to an account or accounts designated by the Seller. . . .

2.6 *Initial Purchase Price Adjustment.*

(a) The parties hereby acknowledge and agree that, no later than three (3) Business Days prior to the Closing, duly authorized representatives of the Seller and Buyer shall jointly conduct and complete a physical count of the Inventory.

(b) By no later than 5:00 p.m., Eastern Time, on the second (2nd) Business Day prior to the Closing Date, the Seller shall prepare and deliver to the Buyer an unaudited pro forma statement of the Inventory as of the Closing Date ("**Estimated Closing Inventory Value**"), prepared in a manner consistent with the methods employed by the Seller in the preparation of the Initial Inventory Value as set forth on Schedule 2.6 ("**Initial Closing Statement**").

(c) At Closing, the Purchase Price will be increased or decreased (as the case may be) on a preliminary basis (the **"Initial Purchase Price Adjustment"**) as follows:

(i) if the Estimated Closing Inventory Value reflected on the Initial Closing Statement is greater than the Initial Inventory Value, then the Purchase Price paid at the Closing shall be increased on a dollar for dollar basis by an amount equal to such excess and paid to the Seller; or

(ii) if the Estimated Closing Inventory Value reflected on the Initial Closing Statement is less than the Initial Inventory Value, then the Purchase Price paid at the Closing shall be decreased on a dollar for dollar basis by an amount equal to such deficiency.

2.7 *Final Purchase Price Adjustment.*

(a) Within ten (10) Business Days after the Closing Date (which period may be reasonably extended by the Seller for a period not exceeding an additional ten (10) Business Days by providing written notice thereof to the Buyer), the Seller shall prepare and deliver to the Buyer unaudited final statements of the Inventory as of 12:01 a.m. on the Closing Date ("**Final Inventory Value**"), prepared in a manner consistent with the methods

employed by the Seller in the preparation of each of the Initial Inventory Value and the Estimated Closing Inventory Value (**"Final Closing Statement"**). During such period and any objection period, the Buyer shall provide the Seller with reasonable access to the books and records of the Seller as may be necessary to complete the Final Closing Statement. The Buyer shall have fifteen (15) Business Days following delivery of the Final Closing Statement to (y) review the Final Closing Statement and the business records with respect thereto, and (z) deliver written objections, if any, in reasonable detail to the Seller. If no written objections are delivered by or on behalf of the Buyer to the Seller within said time period, the Final Closing Statement shall be considered final and binding on the parties for all purposes. If, however, written objections are so timely delivered by the Buyer, then the parties shall, for a period of fifteen (15) Business Days (unless mutually extended by the parties) following delivery of the Buyer's written objections, attempt in good faith to resolve their differences with respect to such objections. Any resolution of such objections by the parties shall be in writing and shall be final and binding on the parties for all purposes. If, however, the parties are unable to resolve any objections within such time period or to mutually agree to extend the time allowed, or to resolve such objections within any extended period of time, then the matter will be submitted to the Bankruptcy Court for final and binding resolution.

(b) When the Final Closing Statement becomes final and binding on the parties, then the Purchase Price hereunder shall be re-calculated based upon the Final Inventory Value to determine the "Final Purchase Price" as follows:

(i) if the Final Purchase Price based upon the Final Inventory Value as reflected in such Final Closing Statement is greater than the Purchase Price calculated and paid at Closing (based upon the Initial Purchase Price Adjustment set forth in Section 2.6(c) above), then the Buyer shall pay to the Seller an amount equal to the difference between the Final Purchase Price and the Purchase Price calculated and paid at Closing; or

(ii) if the Final Purchase Price based upon the Final Inventory Value as reflected in the Final Closing Statement is less than the Purchase Price calculated and paid at Closing (based upon the Initial Purchase Price Adjustment set forth in Section 2.6(c) above), then the Seller shall pay to the Buyer an amount equal to the difference between the Final Purchase Price and the Purchase Price calculated and paid at Closing.

(c) Any amount due pursuant to this Section 2.7 shall be paid promptly by the appropriate paying party to the other party in immediately available funds, but in no event later than ten (10) days after the Final Closing Statement becomes final and binding on the parties.

(d) The Purchase Price shall also be adjusted following the Closing on account of the proration as of 12:01 a.m. on the Closing Date of real property and other Taxes, insurance and utilities with respect to the Acquired Assets.

4.12 *Inventory.* All Inventory is owned by Seller and is valued at an amount determined in accordance with GAAP consistently applied and has been priced at the lower of cost or market on a first-in, first-out basis. Schedule 4.12 also set forth the locations where all Inventory is held or stored. Except as

set forth in Schedule 4.12, no Inventory is subject to any consignment, bill and hold or other similar arrangements.

6.19 *Product Shipments.* During the period from and after the completion of the physical count of the Inventory as set forth in Section 2.6(a) to the Closing Date, Seller shall not ship any product or other orders to customers.

8.8 *Representations and Warranties.* All representations and warranties of the Seller contained in this Agreement and in any schedule or exhibit shall be true and correct in all material respects as of the Closing Date, as if made at the Closing and as of the Closing Date.

9.2 *Termination.*

(a) *Termination.* This Agreement may be terminated and the transactions provided for herein abandoned at any time prior to the Closing Date by:

(i) the mutual written consent of the Seller and the Buyer; or

(ii) Buyer, if any of the conditions set forth in Article VIII hereof shall not have been fulfilled on or prior [sic] June 18, 2002 (as may be extended for a 10–day period to June 28, 2002 pursuant to Section 3.1 hereof) or shall become incapable of fulfillment and shall not have been waived, except if such condition shall have become incapable of fulfillment due to the material and willful breach of the Buyer; or

(iii) Seller, if any of the conditions set forth in Article VII hereof shall not have been fulfilled on or prior to June 18, 2002 (as may be extended for a 10–day period to June 28, 2002 pursuant to Section 3.1 hereof) or shall become incapable of fulfillment and shall not have been waived, except if such condition shall have been incapable of fulfillment due to the material and willful breach of the Seller; or

(iv) Buyer, if the Bidding Procedures Order has not been entered by the Bankruptcy Court on or prior to May 1, 2002; or

(v) Buyer, if the Sale Approval Order has not been entered by the Bankruptcy Court on or before June 28, 2002; or

(vi) Buyer, in the event that all of the APA Documents shall not be approved by the Buyer on or before April 26, 2002 pursuant to Section 6.18 hereof; or

(vii) Seller, if Buyer is not the winning bidder at the Auction.

(b) *Procedure and Effect of Termination.* In the event of termination of this Agreement and abandonment of the transactions contemplated hereby by either or both of the parties pursuant to Section 9.2(a) above, written notice thereof shall forthwith be given by the terminating party to the other party, and this Agreement shall thereupon terminate and the transaction contemplated hereby shall be abandoned without further action on the part of any of the parties hereto, if this Agreement is terminated as provided in this Section 9.2:

(i) all of the terms and provisions of this Agreement shall thereupon be immediately void and without further force or effect, except for the provisions set forth in this Section 9.2 and in Sections 9.1(b) (Termination Fee), 3.3 (expenses), 10.13 (confidentiality) and 10.14 (remedies), respectively;

(ii) all filings, applications and other submissions made pursuant to this Agreement, to the extent practicable, shall be withdrawn from the Governmental Authority to which they were made;

(iii) all Confidential Information from the Seller shall be returned to the Seller, and all Confidential Information from the Buyer shall be returned to the Buyer;

(iv) Buyer shall be entitled to the Termination Fee from the Seller, if and to the extent provided in Section 9.1(b)(ii) hereof and the Bidding Procedures Order; and

(v) the Deposit and any interest earned thereon shall promptly be delivered by Escrow Agent in accordance with the terms of the Escrow Agreement.

10.6 *Choice of Law.* This Agreement shall be construed and interpreted, and the rights of the parties determined in accordance with, the laws of the Commonwealth of Massachusetts (without regard to its conflicts of laws principles). Each party irrevocably consents to the service of any and all process in any action or proceeding arising out of or relating to this Agreement by the transmitting of copies of such process to each party at its address specified in Section 10.5 and in a manner provided for in Section 10.5. The parties hereto irrevocably submit to the exclusive jurisdiction of the Bankruptcy Court (or any court exercising appellate jurisdiction over the Bankruptcy Court) over any dispute arising out of or relating to this Agreement and any other agreement or instrument contemplated hereby or entered into in connection herewith, or any of the transactions contemplated hereby or thereby and any such dispute shall be deemed to have arisen in the Commonwealth of Massachusetts. Each party hereby irrevocably agrees that all claims in respect of such dispute or proceeding may be heard and determined in such courts. The parties hereby irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any such dispute brought in such court or any defense of inconvenient forum in connection therewith.

10.11 *Cumulative Remedies.* All rights and remedies of either party hereto are cumulative of each other and of every other right or remedy such party may otherwise have at law or in equity, and the exercise of one or more rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of other rights or remedies.

10.14 *Remedies.* Seller and Buyer hereby acknowledge and agree that money damages may not be an adequate remedy for any breach or threatened breach of any of the provisions of this Agreement and that, in such event, Seller or its successors or assigns, or Buyer or its successors or assigns, as the case may be, may, in addition to any other rights and remedies existing in their favor, apply to any court of competent jurisdiction for specific performance, injunctive and/or other relief in order to enforce or prevent any violations of this Agreement.

In addition to the APA, the parties also entered into an Escrow Agreement dated April 18, 2002, relating to the $340,000 deposit provided by Parallax. The Escrow Agreement provides in pertinent part:

3. *Release of the Escrowed Funds.*

3.1 Upon receipt by Escrow Agent of a joint written notice from Seller and Buyer to the effect that the Closing under the APA (the "Closing") shall occur and setting forth the date of Closing (the "Closing Notice"), then the Escrow Agent shall deliver the Escrowed Funds, together with all interest earned thereon, to Seller at the Closing, which Escrowed Funds shall be credited towards

payment of the Purchase Price under the APA.

3.4 In respect of the Seller Default Notice (as defined in Section 3.2 hereof) and/or Buyer Default Notice (as defined in Section 3.3 hereof) (collectively, the "Default Notice"), in the event that Escrow Agent and the party giving such Default Notice shall receive a written notice from the other party, i.e., the party receiving such Default Notice (i.e., Seller in the case of the Seller Default Notice and Buyer in the case of the Buyer Default Notice), objecting to the Default Notice (the "Objection Notice") within the ten-day period set forth in Sections 3.2 and 3.3 hereof, respectively, then Escrow Agent shall not release any Escrowed Funds in accordance with the Default Notice, but shall continue to hold the Escrowed Funds claimed in the Default Notice, together with any interest earned thereon, until the receipt by Escrow Agent of either: (i) joint written instructions of Buyer and Seller directing the Escrow Agent to release the Escrowed Funds in accordance with such written instructions; or (ii) a certified copy of a final court order no longer subject to appeal. Upon its receipt of either (i) or (ii) above, then Escrow Agent shall promptly deliver the Escrowed Funds in accordance with the terms thereof

3.5 Upon receipt by Escrow Agent of written notice from Buyer to the effect that the APA has been terminated due to the failure each of the APA Documents to be approved by Buyer on or prior to the APA Document Approval Date (as set forth in Section 6.7 of the APA (the "APA Document Default Notice"), then Escrow Agent shall promptly deliver the Escrowed Funds, together with any interest thereon, to Buyer). Neither Seller nor any other Person shall have the right to issue or give any Objection Notice or any other notice to Escrow Agent disputing in any manner the APA Document Default Notice, and upon receipt of such APA Document Default Notice, Escrow Agent shall in all events promptly deliver the Escrowed Funds to Buyer.

3.6 Notwithstanding anything to the contrary contained in this Agreement and/or the APA, if the Escrowed Funds shall be delivered by Escrow Agent to Seller pursuant to Section 3.3 hereof, then the Escrowed Funds so delivered to Seller shall be deemed to constitute liquidated damages in respect of any and all claims, debts, liabilities or obligations arising out of or relating to the APA, this Agreement or otherwise. The parties hereby acknowledge that such liquidated damages hereunder, i.e., the Escrowed Funds, are not intended as a penalty, but have been agreed upon due to the practical impossibility of foreseeing or predicting the extent of damage or loss which may be suffered by Seller in the event of any such termination of the APA as set forth in Section 3.3 hereof, and that such sum constitutes a fair and reasonable amount of damages in view of the circumstances.

## C. *The Price Dispute*

As set forth above, the APA provided procedures for obtaining the final purchase price. The parties specifically agreed to a multiple step process for the adjustment of the sales price, either upward or downward, due to changes in the value of inventory pending a closing. They agreed that inventory was to be valued in accordance with Generally Accepted Accounting Principles ("GAAP"). The starting point for the purchase price was the book value of inventory as of February 23, 2002, re-

ferred to as Schedule 2.6.[2] Two business days prior to the closing of the sale the Debtor was obligated to provide an Estimated Closing Inventory Value to Parallax so that the purchase price could be adjusted up or down. The APA further provided that the purchase price would be adjusted one final time after the closing and that the Debtor was required to provide a Final Inventory Value in the form of a Final Closing Statement within ten business days after the closing.

During the spring of 2002, in connection with its renewed offer to purchase, Parallax's representatives, for a second time, performed due diligence and inspected the Debtor's books, records, and inventory. The parties, through their respective officers and accountants, met at the Debtor's New Bedford plant during the week of June 10, 2002. They completed a joint physical inventory on June 13 or 14, 2002, and agreed that a downward adjustment of the price was warranted. However, a dispute over the extent of the inventory adjustments developed. In contemplation of the closing of the sale to Parallax in late June 2002, the Debtor moved the inventory from Juarez, Mexico to storage in El Paso, Texas.

F. Randal Hunt ("Hunt"), the Debtor's Chief Financial Officer, prepared a statement showing an Initial Purchase Price Adjustment of $1,234,000. (*Compare* Exhibit 9, Schedule 2.6/ Initial Inventory Value at February 23, 2002 *with* Exhibit 10, Initial Closing Statement Schedule 2.6(b)/ Inventory Value at June 21, 2002). Parallax countered, asserting that the price should be adjusted downward by $3,904,000. Ira Schapiro ("Schapiro"), of the accounting firm McGladrey & Pullen, LLP, Parallax's accountant, questioned the Debtor's inventory reserves and concluded that the Debtor had failed to value its inventory in accordance with GAAP. In a memorandum dated June 18, 2002, Schapiro expressed the opinion that additional inventory reserves for work in process, obsolete raw materials and goods, filter inventory and manufacturing variances warranted a further $2,531,000 downward adjustment in the purchase price.

By letter dated June 18, 2002, Nathan J. Mazurek ("Mazurek"), an authorized representative of Parallax, wrote to Robert Elliott ("Elliot"), the Debtor's president, and stated that the Initial Purchase Price Adjustment for inventory should be approximately $4,600,000 based upon Schapiro's memorandum. (Exhibit 4 to the Affidavit of Robert E. Richards, Jr.). By letter dated June 18, 2002, Mazurek again wrote to Elliott, acknowledging completion of the physical count and an extension of the closing to June 25, 2002. He further advised Aerovox that its shipment of orders between June 13, 2002 and the closing date was a material breach of Section 6.19 of the APA, despite the representation in open court on June 4, 2002 that the Debtor would be permitted to operate after the inventory count. In addition, Mazurek reserved Parallax's rights and remedies pursuant to the terms of the APA, including the right to demand another physical count of the inventory.

Thereafter, the parties' attorneys exchanged a series of letters disputing the adjustments to the purchase price based on inventory changes. By letter dated June 19, 2002, Attorney Harold Murphy ("Murphy"), representing Aerovox, disputed the price adjustment Mazurek set forth in his June 18, 2002 letter. He further indicated that the Estimated Closing Inventory Value would be delivered to Parallax on or before the close of business on June 21, 2002 and stated that it was the

---

**2.** Schedule 2.6 contained the actual physical inventory count.

Debtor's intention to close the sale on June 25, 2002. Murphy also reiterated the Debtor's position that disputes over the price adjustment were to be resolved post-closing under Section 2.7 of the APA.

By letter dated June 20, 2002, Attorney Joshua Glikman ("Glikman"), representing Parallax, responding to Murphy's June 19, 2002 letter, stated Parallax's position that a so-called "Inventory Reserve Adjustment" of $2,531,000 was warranted by the facts, i.e., the Schapiro memorandum, and prescribed by the APA. He further wrote: "Accordingly, we demand a closing of the transaction contemplated under the APA, consistent with the adjustments compelled under the terms thereof, or, at least, a writing by Aerovox explaining why this Inventory Reserve Adjustment should not be included in the Initial Purchase Price Adjustment." Glikman further expressed disagreement with the Debtor's position that inventory disputes were to be resolved post-closing, stating that "Section 2.7 is not ... applicable to the resolution of pre-Closing disputes relating to the Initial Purchase Price Adjustment" and indicated that Parallax was "fully ready, willing and able to close the contemplated sale and purchase transaction ... on June 25, 2002" as long as the price were reduced by $3,904,000.

Consistent with Murphy's representation, the Debtor provided the Estimated Closing Inventory Value to Parallax on June 21, 2002 containing its version of the closing adjustments for inventory as of that date. In a letter of the same day, Murphy wrote to Glikman, responding to Parallax's accounting firm's memorandum. He articulated the Debtor's position that no additional reserves were necessary under GAAP for inventory reserves, including work in process, obsolescent reserves, filter inventory or manufacturing variances. In a response dated June 24, 2002,

Glikman wrote to Murphy demanding a closing using Parallax's version of the price adjustment. He also complained of certain missing closing documents and demanded preparation of all necessary closing documents.

Glikman testified that he called Robert E. Richards, Jr. ("Richards") at the Debtor's law firm on June 24, 2002, and advised him that Parallax would not close the sale on June 25, 2002. Richards testified that he did not speak with Glikman on that date. Parallax did not appear at Debtor's counsel's offices on the morning of June 25, 2002 to close the sale. Glikman stated, in a letter dated June 25, 2002 sent by facsimile later that day to Murphy, "Please note that we advised Bob Richards, Esq. of your office yesterday afternoon that Parallax is ready, willing and able to close the sale and purchase transaction based upon the terms and provisions mandated by the APA, including the Initial Purchase Price Adjustment in the amount of $3,904,000.00 in the aggregate." In the letter, Glikman acknowledged receipt of the closing documents, after business hours on June 21, 2002, with the exception of an estoppel certificate for a sublease of the New Bedford plant. The letter concluded as follows: "Please be advised that, once again Parallax remains ready, willing and able to close the transaction based upon the Initial Purchase Price Adjustment mandated by the APA." Parallax did not send a written notice to the Debtor or its attorneys terminating the transaction as required by Section 9.2(b) of the APA.

At the evidentiary hearing held on June 28, 2002, Elliot and Hunt testified concerning the Debtor's actions in contemplation of the sale and the consequences of the failure to close. Elliott testified that the Debtor had closed its Juarez, Mexico facility and moved all of the inventory to El Paso, Texas. He recounted how the Debt-

or shut down production and terminated employees at the Juarez, Mexico facility and vacated the premises in contemplation of Parallax's purchase of the Mexican inventory. Furthermore, he stated that the Debtor closed the sale of the equipment and other assets in its Mexico operation to Nueva Generacion Manufacturas in reliance on the closing of the sale to Parallax. Moreover, Elliott described how the Debtor permitted Parallax to contact the Debtor's customers about the proposed sale which has resulted in a decline in sales over the past several weeks. According to Elliot, the Debtor is unable to propose a plan if the sale to Parallax fails. Absent an order compelling Parallax to close the sale, Elliot testified that the Debtor would be required to immediately shut down operations.[3] According to Elliott, denial of an order compelling the sale would cause a number of parties injury. He observed that customers with orders would be stranded and over two hundred employees who were notified that their jobs would continue with Parallax would be out of work. Moreover, cessation of operations would destroy any remaining goodwill and prospects for another sale. Elliott testified that during the third week of June the Debtor has received an overture of interest from another potential buyer; however, no offer or written expression of interest had been made. He further conceded that the Debtor does not have a reorganization plan in prospect. The Debtor's creditors, who were to be paid from the proceeds of the sale, would not be paid, and administrative expenses, including liabilities under the order approving the Debtor's Key Employee Retention Program ("KERP"), would increase. Absent an immediate sale, both Hunt and Elliott indicated that the Debtor's secured lenders

will seek and obtain immediate relief from stay, causing great harm to creditors and the estate.

Although Parallax called several witnesses, their testimony concerning GAAP, inventory reserves, and the appropriate inventory adjustment is not germane to resolution of the Injunction Motion. Glikman testified that his intention in his letters was to terminate the APA unless the Debtor closed in accordance with Parallax's inventory adjustments. Parallax did not introduce any evidence in the form of correspondence from Glikman or otherwise expressly terminating the APA.

## III. POSITIONS OF THE PARTIES

### A. Aerovox

The Debtor requests that the Court enter a preliminary injunction compelling Parallax to immediately perform its obligations under the APA, close the sale, pay the entire purchase price, and order that the disputed amount of the adjustments due to inventory changes be held in escrow pending a determination of the appropriate amount. It asserts that specific performance is the appropriate remedy, as money damages are inadequate to redress the estate's injury. The Debtor emphasizes that the APA specifically reserves each party's right to sue for specific performance.

The Debtor also argues that it has satisfied its burden of proving entitlement to an injunction compelling Parallax to close the sale on the grounds that Parallax is in breach of the APA. Aerovox maintains that it fully complied with the terms of the APA, the Escrow Agreement and the Sale Order. It contends that Parallax did not

---

**3.** Indeed, the record of proceedings in the Debtor's Chapter 11 case reflects that the cash collateral stipulation with the Debtor's major secured lender, Fleet Bank, expired on June 28, 2002.

properly terminate the APA and that its failure to close the sale was unwarranted. Moreover, the Debtor contends that Parallax is not entitled to condition the closing on its demand for an additional adjustment to the purchase price. Although Aerovox believes that a downward adjustment in the purchase price is warranted in the sum of $1,234,000, it seeks an escrow of the disputed amount.

According to the Debtor, it complied with the terms of the APA relating to inventory adjustments and that Parallax's demand for further adjustments is unwarranted and that Parallax was not justified in refusing to close the sale, as the APA contemplated post-closing adjustments. The Debtor asserts that its creditors and the estate will suffer irreparable harm if the closing does not occur, as it is unable to continue operations and reorganize, that on balance, the relative harms from an injunction weigh in favor of the Debtor, and that the public interest favors an order compelling specific performance. In addition to an order requiring Parallax to close the sale, Aerovox requests that the Court require the parties to place into escrow the sum of $2,531,000, (the amount Parallax contends is the proper adjustment) from the purchase price pending a resolution of the dispute over the adjustments to inventory.

### B. *Parallax*

Parallax opposes the issuance of a preliminary injunction compelling specific performance. It argues that, in the event the Court finds that it breached the APA, the Debtor has an adequate remedy at law, namely, monetary damages. Furthermore, Parallax contends that the Debtor has waived its right to specific performance because the Escrow Agreement contains a provision for liquidated damages, namely forfeiture of the deposit,

which should be considered the exclusive remedy for breach of the APA. Furthermore, Parallax maintains the Debtor has not sustained its burden of proving the prerequisites to a preliminary injunction, specifically, the likelihood of success on the merits and irreparable harm. According to Parallax, it is not in breach of the APA, and it has no obligation to close the sale. Instead, Parallax asserts that the Debtor has in fact breached the APA because the Debtor made material misrepresentations concerning its inventory, did not follow GAAP, and did not deliver necessary closing documents to Parallax. Thus, Parallax believes that it was justified in not going forward with the sale and that it properly terminated its obligations to close under the APA. Finally, as an alternative argument, Parallax requests that, in the event the Court orders specific performance of the APA, the Debtor should be required to make purchase price adjustments in accordance with Parallax's accounting in the approximate sum of $2,531,000, and not the adjustment advocated by the Debtor in the sum of $1,234,000.

## IV. DISCUSSION

### A. *Preliminary Injunction Standard*

In determining whether preliminary injunctive relief is appropriate, the United States Court of Appeals for the First Circuit has directed trial courts to consider: 1) the likelihood of success on the merits; 2) the potential for irreparable harm if the injunction is denied; 3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and 4) the effect, if any, of the court's ruling on the public interest. *See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 15 (1st Cir.1996) (citations omitted). The burden of proof is on the moving party to

establish all four requirements. *See I.P. Lund Trading ApS v. Kohler, Co.,* 163 F.3d 27, 33 (1st Cir.1998).

■ In proving the first element, likelihood of success on the merits, "the movant need not demonstrate that there is no chance that he will lose." *A.W. Chesterton Co., Inc. v. Chesterton,* 907 F.Supp. 19, 22 (D.Mass.1995). In weighing a request for injunctive relief, courts have adopted a "sliding scale" approach; the greater the harm the less emphasis need be placed on the likelihood of success on the merits. *See A–Copy, Inc. v. Michaelson,* 599 F.2d 450, 451 (1st Cir.1978).

■ It is well settled that lack of an adequate remedy at law is a substantial element of irreparable harm. If money damages will adequately redress harm, injury is not considered irreparable. Injunctive relief is not warranted where damages suffice. *See Ocean Spray Cranberries, Inc. v. Pepsico, Inc.,* 160 F.3d 58, 61 (1st Cir.1998); *Medika Intern., Inc. v. Scanlan Intern., Inc.,* 830 F.Supp. 81, 89 (D.P.R. 1993). "In commercial litigation, the question whether the plaintiff is likely to suffer irreparable injury may be cast in terms of whether the plaintiff has available a legal remedy adequate to compensate it for its injuries." *Itek Corp. v. First Nat'l Bank of Boston,* 566 F.Supp. 1210, 1216 (D.Mass. 1983). This element, as discussed below, involves an interpretation of Massachusetts contract law.

■ Uncertainty in calculating damages may be considered irreparable harm sufficient to warrant injunctive relief. For example, injunctive relief requiring specific performance of a contract may be granted where monetary damages are uncertain and difficult to assess, where the harm caused by a breach of contract, although economic in nature, is impossible to assess or significantly difficult to measure accu-

rately. *See Ocean Spray Cranberries,* 160 F.3d at 61. In *Ross–Simons* the First Circuit elaborated:

> To establish irreparable harm, however, a plaintiff need not demonstrate that the denial of injunctive relief will be fatal to its business. It is usually enough if the plaintiff shows that its legal remedies are inadequate. If the plaintiff suffers a substantial injury that is not accurately measurable or adequately compensable by money damages, irreparable harm is a natural sequel. Thus, a cognizable threat of such harm can support a restraining order ...
>
> Although there is no mechanical test that permits a court to make an exact calculation of the quantum of hard-to-measure harm that will suffice to justify interim injunctive relief, there are some relevant guideposts. In the first place, the plaintiff's showing must possess some substance; a preliminary injunction is not warranted by a tenuous or overly speculative forecast of anticipated harm. In the second place, an attempt to show irreparable harm cannot be evaluated in a vacuum; the predicted harm and the likelihood of success on the merits must be juxtaposed and weighed in tandem. Finally, it is clear that battles over the quality and quantity of the harm alleged most often will be won or lost in the trial court.

*Ross–Simons,* 102 F.3d at 18 (citations omitted). *See also Chesterton,* 907 F.Supp. at 23 (stating "[i]njunctive relief is appropriate when damages are difficult to measure."). In *K–Mart Corp. v. Oriental Plaza, Inc.,* the First Circuit upheld a finding of irreparable harm supporting a preliminary injunction prohibiting a landlord from constructing new space in front of a K–Mart store. 875 F.2d 907 (1st Cir.1989). The court found that the losses of revenues were "sufficiently problematic

as to defy precise dollar quantification." *Id.* at 915. Similarly, in *Ross–Simons,* the First Circuit upheld an injunction against a famous supplier of crystal who refused to continue its supply agreement to a retailer on the ground that its breach would not only undermine the business, but would damage the retailer's goodwill and reputation and third party customers, which injuries were not easily measured or fully compensable in damages. 102 F.3d at 20. The court, however, determined that business failure it not required to establish irreparable harm. *Id.* at 18.

### B. *Massachusetts Contract Law*

In this case, the parties agreed that any disputes concerning the APA and the Escrow agreement are to be determined by Massachusetts law. Thus, the parties' choice of law governs the outcome of this contract dispute.

▇▇▇▇ The general common law rule is that equitable remedies are not available to those who can be adequately compensated at law. The availability of monetary damages, however, does not necessarily bar a suit in equity for specific performance. *See Greenfield Country Estates Tenants Ass'n Inc. v. Deep,* 423 Mass. 81, 666 N.E.2d 988 (1996). Whereas in many jurisdictions the legal remedies of damages and restitution are the preferred method of redressing breaches of contract, and specific performance is a remedy limited to real estate, Massachusetts law is more liberal with respect to the availability of specific performance. Under Massachusetts law, contracting parties also have available the equitable remedy of specific performance, a decree ordering a party to affirmatively carry out his contractual duties or enjoining it from violating the contract. Mass.Gen.Laws Ann. 214, § 1A (West 1989). *See Poltorak v. Jackson Chevrolet Co.,* 322 Mass. 699, 700, 79 N.E.2d 285, 286–87 (1948); *Ropes v. Upton,* 125 Mass.

258 (1878). Moreover, Massachusetts law allows specific performance on contracts for personalty. *See Poltorak,* 322 Mass. at 700, 79 N.E.2d 285 (1948); *Rigs v. Sokol,* 318 Mass. 337, 342, 61 N.E.2d 538, 541 (1945). The test for specific performance in the case of a contract for the sale of personalty is the same as for real estate, namely whether damages for the breach are or are not the equivalent of the promised performance.

Among the factors to be considered in granting a decree for specific performance, the most important seem to be the following: difficulty and uncertainty in determining the amount of damages to be awarded for the defendant's breach; ... [and] *the insufficiency of money damages to obtain the duplicate or the substantial equivalent of the promised performance,* either because the subject matter is unique in character and cannot be duplicated or because the obtaining of a substantial equivalent involves difficulty, delay and inconvenience.

*Triple–A Baseball Club Assoc. v. Northeastern Baseball, Inc.,* 832 F.2d 214, 224 (1st Cir.1987) (quoting 5A Corbin on Contracts § 1142 at 117 (1964 & Supp.1982)) (emphasis added); *Poltorak,* 79 N.E.2d at 286–87. Indeed, the Supreme Judicial Court has stated: "Whether specific performance should be granted is within discretion of the judge." *Greenfield Country Estates,* 423 Mass. at 88, 666 N.E.2d 988 (citing *Raynor v. Russell,* 353 Mass. 366, 367, 231 N.E.2d 563 (1967)).

▇▇▇▇ Massachusetts law is clear that the existence of a liquidated damages clause is not a bar to an action for specific performance. *See Rigs,* 318 Mass. at 342–43, 61 N.E.2d 538; *North American Consolidated, Inc. v. Kopka,* 644 F.Supp. 191 (D.Mass.1986); *De Blois v. Boylston &*

*Tremont Corp.*, 281 Mass. 498, 518, 183 N.E. 823 (1933). In *Rigs,* the court stated: "the parties ordinarily contemplate that the contract be performed and that the provision for a penalty or liquidated damages in the event of a breach is intended as security for performance and not as a price for the privilege of nonperformance." 318 Mass. at 343, 61 N.E.2d 538. A liquidated damages clause does not preclude other remedies available at law or equity absent the clear intention of the parties. *See Carroll v. Barberry Homes, Inc.*, 1999 WL 1204020, at *2, 99 Mass.Super. LEXIS 450, at *8 (1999).

 Finally, under Massachusetts law contracts are interpreted to further the expressed intention of the parties and should not be interpreted to render any provision meaningless. *See Shea v. Bay State Gas Co.*, 383 Mass. 218, 418 N.E.2d 597 (1981).

C. *Analysis*

 As to the first prerequisite to injunctive relief, likelihood of success on the merits, the Court finds that Aerovox has established more than a reasonable likelihood of success on the merits of its Complaint. The Debtor established that it was ready, willing and able to close the sale in accordance with the APA on June 25, 2002. It demonstrated that Parallax was unjustified in refusing to close the court-approved sale with an escrow in the amount of the disputed inventory adjustments.

Parallax did not establish any defense or excuse for its breach in refusing to close the sale on June 25, 2002. Parallax was not entitled to refuse to close the sale by virtue of a dispute over the Estimated Closing Inventory Value, and its unsubstantiated interpretation of Sections 2.6 and 2.7 of the APA, namely that it could condition the closing on its "Inventory Reserve Adjustment." Under Section 2 of

the APA, the purchase price and adjustments to it were based upon the value of the inventory according to the Debtor's books and records. The parties agreed to count the inventory three times, twice before the closing and once after the closing to reach the final purchase price. The APA did not give Parallax the right to refuse to close because it disagreed with the Debtor's inventory value in the Initial Inventory Value Statement (Exhibit 9) or in the subsequent Estimated Closing Inventory Statement (Exhibit 10). Rather, a plain reading of Sections 2.6 and 2.7 obligates Parallax to close based upon the Estimated Closing Inventory Value prepared by the Debtor and pursue any objections post-closing in accordance with the detailed procedures outlined in Section 2.7, which contemplates a Final Inventory Value as of the closing date. If Parallax disagreed with the Initial Inventory Value statement it could have refused to execute the APA or continue negotiations with the Debtor over the purchase price. If it disagreed with the Estimated Closing Inventory Value statement, it could have given the Debtor a written notice of termination in accordance with Section 9.2 of the APA. Instead, it did neither, insisting that it would only close with its Inventory Reserve Adjustment, in contravention of the express terms of the APA.

Parallax's contention that the Debtor breached the APA by misrepresenting the value of its inventory, in particular, by failing to value inventory in accordance with GAAP in violation of Section 4.12, and by failing to submit certain closing documents were not sufficient reasons to refuse to close where Parallax did not terminate the APA by sending written notice to the Debtor of any alleged breaches of the APA as required by Section 9.2(b). If Parallax believed the Debtor had made false representations or had not valued inventory in

accordance with GAAP, its remedy was to terminate the APA by written notice of termination under Section 9.2. Indeed, Parallax in its letters to the Debtor and Debtor's counsel indicated a willingness to close, albeit on its terms. It did not purport, directly or indirectly, to cancel the sale because of a breach of Section 6.14.

The Court rejects Parallax's argument that the Debtor breached Section 6.19 of the APA by shipping inventory to customers after the initial closing statement. The record of proceedings at the hearing held on June 4, 2002 on approval of the Motion to Sell establishes that the parties agreed that the Debtor's business would continue to operate after the initial inventory count as a condition of the extension of the closing date. This modification of the APA was stated on the record by Debtor's counsel in the presence of Parallax's counsel, Attorney Karen Ostad of Kelley Drye.

With respect to the second prerequisite to injunctive relief, irreparable harm, the Court finds that the Debtor sustained its burden on the element of irreparable harm. First and foremost, in Paragraph 10.14 of the APA, the parties agreed that money damages might not be sufficient and that injunctive relief and specific performance were appropriate remedies to redress a breach of the APA. By acknowledging in the APA the inadequacy of money damages and the propriety of an action for specific performance and injunctive relief for breach, Parallax cannot now claim money damages are the only recourse for breach. Moreover, Massachusetts law contemplates specific performance even if a plaintiff has a remedy for damages in cases where, like here, no other existing remedy or the damages recoverable is the equivalent of performance. In other words, where the damages are the sales price, specific performance is the only practicable remedy.

Second, the Debtor submitted substantial evidence of irreparable harm. In reliance on the sale to Parallax, the Debtor shut down its Mexico operation, sold it, and moved inventory to a warehouse in Texas. The Debtor's actions are irreversible. Absent injunctive relief, the prospects for its liquidating Chapter 11 plan, premised on the sales of the three major components of its business (the British subsidiary, the Mexican operation, and New Bedford facility), will be destroyed. There is no other buyer on the scene, and it is unlikely that the Debtor can obtain other comparable offers at this stage of the case because its relationships with its vendors and suppliers has been compromised by its reliance on Parallax's failure to give proper notice of termination. In the event the injunction is denied, it is likely that the secured creditors will be granted relief from stay and their recoveries on their collateral, as well as the dividend to unsecured creditors, if any, will be significantly diminished. The failure to close this sale will have an immediate adverse impact on the Debtor, its creditors, the bankruptcy estate, and the integrity of the sales process in bankruptcy cases.

Finally, the Debtor has shown that money damages to the bankruptcy estate resulting from Parallax's breach, other than the contract price subject to appropriate adjustments, are not capable of being ascertained with certainty and will not fully alleviate harm to its creditors and the estate. Although arguably, consequential damages may be capable of calculation at some future time, they cannot be calculated now or for the foreseeable future and are too speculative to be susceptible to proof. The Debtor's inability to continue operations will cause substantial damage to any good will that has survived this litigation, and make any sale other than foreclosure impossible. It is thus imprac-

ticable to assess money damages to redress the injury caused to its estate other than the full contract price, subject to Section 2.7 of the APA.

█ The Court recognizes that specific performance is a drastic remedy. However, the Court finds that the Debtor is entitled to the remedy of specific performance under the circumstances of this case. As mentioned previously, under Section 10.4 of the APA, the parties agreed that money damages may not be an adequate remedy for breach of the agreement and that either party was entitled to seek injunctive relief and specific performance of their obligations. The liquidated damages provision of the Escrow Agreement does not defeat the Debtor's suit for specific performance. Only termination of the APA triggers the remedies under the Escrow Agreement, namely recovery of the deposit. Here, neither party terminated the APA in writing. Parallax's letters, by its attorneys and representatives, did not constitute a termination of the APA. Furthermore, under Massachusetts law, a party is entitled to pursue specific performance notwithstanding a liquidated damages provision if the parties intended the provision to be security for performance, as opposed to a clear intention that the deposit was to be the sole and exclusive remedy for breach. The parties did not intend that the deposit would be a fixed amount of liquidated damages in the event either breached the APA. Moreover, Mass.Gen.Laws Ch. 214, § 1A expressly authorizes an action for specific performance even if there is a damages remedy. Accordingly, the Court rejects Parallax's argument that the liquidated damages provision of the Escrow Agreement bars specific performance of the APA.

As to the third element of injunctive relief, the Court finds that a balancing of the harms weighs in favor of entry of the requested injunction. Parallax did not introduce any evidence of harm to it as a result of the entry of the requested injunction. Parallax's sole issue with closing is a dispute over the purchase price due to the timing and amount of adjustments for inventory. Parallax's rights to dispute the purchase price are protected in the APA. The Debtor requested an escrow of the disputed sums, and the Court need not make any determination as to the Final Purchase Price at this time. Rather, the disputed sum can be escrowed and the accurate purchase price can be litigated with both parties afforded an opportunity to present evidence and be heard.[4] Thus, Parallax will not be harmed as long its right to dispute the Final Purchase Price is subject to judicial determination in accordance with Section 2.7 of the APA. Indeed, Parallax may well be correct in its assessment of the appropriate adjustments to the purchase price. If Parallax is confident in its assessment and its rights are protected, then the controversy really pertains to the interest that could be earned on the sum the Debtor seeks to place in escrow, or some other reason. Viewed in this light, Parallax's position appears to be a pretext to escape from an agreement it no longer views as in its best interest because the amount of interest that can be earned on the amount to be held in escrow for 45 days or the time within which this Court could resolve the dispute would be relatively insignificant compared with the total contract price should Parallax prevail.

---

4. On June 26, 2002, the Court issued an Order directing the parties to show cause why an expert witness should not be appointed to express an opinion on the appropriate purchase price. The parties filed responses and this matter is still pending before the Court.

As to the fourth prerequisite to injunctive relief, the Court finds that the public interest weighs in favor of the request. First, there is a strong public interest in preserving the integrity of bankruptcy sales and upholding contracts approved by the Court. *See In re Gil–Bern Industries, Inc.*, 526 F.2d 627 (1st Cir.1975) (stating that it is important that "nothing impair public confidence in the regularity of judicial sales."). Based upon the clear evidence of Parallax's breach introduced at the June 28, 2002 hearing, the Court finds that Parallax's conduct was at best puzzling because it had the opportunity to terminate the APA and failed to do so and at worst indicative of last ditch ploy to unfairly amend the agreed upon procedures for ascertaining the Final Purchase Price to obtain an unfair advantage given the Debtor's dire financial condition.

Absent an order compelling Parallax to close the sale and escrow the disputed price adjustments, the Debtor's orderly liquidation of its assets in Chapter 11 will cease. Instead, the case likely will be converted to Chapter 7 and relief from stay granted allowing secured creditors to foreclose on their collateral leaving substantial deficiency claims against the estate and eliminating the likelihood of a dividend to unsecured creditors. Thus, payment of secured debt as agreed in stipulations approved by the Court, and payment of a dividend to unsecured creditors will be unlikely if the injunction is denied. Pursuant to the APA, Parallax had agreed to employ a substantial number of the Debtor's employees at the New Bedford plant. If the injunction is denied over two hundred people will be unemployed, adversely affecting that community's economy, and increasing administrative expense claims as a result of their termination.

Bankruptcy sales are different from sales that are negotiated in less structured and less public commercial settings. Bankruptcy sales are subject to the provisions of 11 U.S.C. § 363, Fed.R.Bankr.P. 6004 and local rules. The Bankruptcy Court must approve the sale after notice and a hearing, as well as the opportunity for higher offers and objections. The Court must makes specific findings with respect to the good faith of the buyer and the reasonableness of the purchase price. When a buyer fails to close a Court authorized sale, questions arise as to whether the sales process maximized the price obtained and whether the sale has been chilled and other bidders were or will be deterred by virtue of the buyer's conduct. Creditors, employees and other third parties, such as vendors and municipalities in which the Debtor operates, are adversely affected by sales that fail to close. In this context, an order for specific performance with an escrow of disputed amounts is in the public interest.

## V. CONCLUSION

Based upon the findings of fact and conclusions of law set forth above, the Court finds that the Plaintiff has met the requirements for issuance of the preliminary injunction requested in the Motion. A separate order will issue granting the Motion and ordering the Plaintiff and the Defendant to forthwith close the sale and escrow the disputed sum of $2,531,000.

### ORDER

In accordance with the Memorandum dated July 9, 2002, the Court hereby grants the Motion of the Debtor, Aerovox, Inc. for Injunction Compelling Specific Performance of Asset Purchase Agreement and Escrow of Disputed Funds. The Plaintiff and the Defendant are ordered to forthwith close the sale of the assets subject to the Asset Purchase Agreement and hold the sum of $2,531,000 in a joint, inter-

est bearing escrow account until further order of the Court.