**WAUSAU MOSINEE PAPER CORPORATION, Plaintiff,**

v.

**David J. MAGDA, Defendant.**

**No. CIV. 05–09–B–MJK.**

United States District Court, D. Maine.

March 25, 2005.

David S. Sherman, Jr, Drummond, Woodsum & MacMahon, Portland, James F. Harrington, Ruder, Ware & Michler, LLSC, Mary Sue Anderson, Ruder, Ware & Michler, LLSC, Wausau, WI, Wausau Mosinee Paper Corporation, for Plaintiff.

Glenn Israel, Bernstein, Shur, Sawyer, & Nelson, Portland, Thomas G. Collins, Buchanan Ingersoll PC, Harrisburg, PA, David J Magda, for Defendant.

## MEMORANDUM OF DECISION [1] ON MOTION FOR PRELIM- INARYINJUNCTION

KRAVCHUK, United States Magistrate Judge.

On March 16, 2005, I held an evidentiary hearing on plaintiff's motion for a preliminary injunction in this case involving a contractual dispute over a non-compete agreement. This difficult case presents thorny issues involving business ethics and the economic dynamics of the highly competitive specialty and engineered paper industry set against the backdrop of an individual's conflict between his professional and family obligations. The case also raises the perennially troublesome issue of when and to what extent covenants not to compete will be enforced in Maine's courts. In the final analysis I conclude that the employer, Wausau Mosinee Paper Corporation (now WausauPaper) is more likely than not to succeed in its quest for injunctive relief at law, but that the additional, equitable factors that must be considered do not justify an imposition at this time of injunctive relief that would require the defendant to immediately cease working for his current employer.

### Findings of Fact

Otis Mill, located in Jay, Maine, is one of at least three specialty mills operated by WausauPaper in Maine, Wisconsin, and Mississippi. These mills form the specialty products group of WausauPaper, making specialized papers including, but not limited to, microwave popcorn bags, bumper sticker backings, "creped" papers, masking tapes, and release papers commonly used in food handling operations. WausauPaper has over 1200 employees working in these mills, including the 250 employees in Maine at Otis Mill. Wausau-Paper has been in existence in one form or another for over 100 years, but the specialty products group is a somewhat newer division of the company. These specialty papers are made at smaller mills, often older mills that have been refurbished, because typically the run size of each application is too small to make it profitable to produce the specialty papers on the largest papermaking machines. Because the industry has the potential of being highly profitable, it is also highly competitive and requires the industry leaders to spend a great deal of time, money and skill on product development.

Otis Mill became part of WausauPaper in 1997, but has operated as a paper mill for many years prior to that. Emerson Brooks, the person responsible for the day to day operation of Otis Mill and defendant Magda's former direct supervisor, has worked at the mill since 1978. Otis Mill as it now exists is constantly involved with new product development with a special emphasis on its "deep-color" paper line, producing items such as the red Williams–Sonoma shopping bags, and other novel technologies involving release papers, super coated papers, and what are called super calendared release liners, for instance the throw away paper that supports the adhesive on a "MY NAME IS" tag. In order to succeed in the specialty papers market it is necessary for a company to constantly reinvent itself in accordance with the demands of the marketplace.

In March 2002, Wausau Paper's management determined that all new sales and product development employees would be required to sign a non-compete agreement upon employment with the company. Existing sales and product development em-

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

ployees had already been required to sign confidentiality agreements and new hires would also be required to do that as well. Existing employees were not asked to sign non-compete agreements. The form non-compete agreement (Ex. 11) contains a narrowly drawn restrictive covenant prohibiting the employee from, *inter alia,* accepting employment with certain conflicting organizations for a one year period. The conflicting organizations are enumerated in an "Exhibit A" to the agreement, which WausauPaper reserves the right to update on a periodic basis. At the time that David Magda signed the form, Exhibit A listed fourteen competitors and customers of WausauPaper. The agreement further provided that although the list of companies could change over time, the number of conflicting organizations would never exceed fourteen. Glatfelter, Magda's current employer, was included within that list.

The one year employment prohibition meets Wausau's need to insure that employees will not take design ideas that are in process to a competitor. John Katchko, Wausau's vice-president for product development, testified that given the specialty paper group's need to constantly develop new products, the one-year limitation is essential to maintain a competitive advantage and that, in the aggregate, one year represents a fair approximation of the product development curve. The agreement also provides that for a two-year period the company's confidential information must be held in strict confidence regardless of employment, and, of course, a requirement that trade secrets will forever be held secret.

At the time the non-compete agreement became company policy there is no indication that Mike Behrens, the vice-president of human resources for the specialty products division, informed his subordinate human resources directors at the specialty mills how to implement the policy other than to present the form agreement to new hires on the day they commenced employment and completed other company paperwork. There was no company-wide policy that the existence of the non-compete provision be discussed in the interview process or presented with the offer of employment. From the time the policy was instituted in March 2002 through the commencement of Magda's employment on June 30, 2003, Steve Wilkins, the director of human resources at the Otis Mill never had occasion to obtain a non-compete agreement from a new hire.

In April 2004, Wausau revised the list of conflicting organizations by decreasing the number of named organizations to twelve and limiting the Glatfelter restriction to those divisions or operations within the company that compete directly with the specialty paper group of Wausau. Behrens also e-mailed Wilkins and other human resource directors to advise them that the non-compete agreements apply to both new hires and promotions within the sales and product development areas of the specialty products group.[2] Behrens further cautioned the human resource directors that in the future the existence of the non-compete provision needs to be presented earlier in the interview process in order to avoid a "backlash" or misunderstanding regarding employment agreements.

**2.** The record does not establish when the requirement was extended to promotions, although sometime between March 2002 and April 2004 it was obviously so extended. Emerson Brooks, Magda's immediate supervisor at the Otis Mill, and a person identified as a product development employee, was promoted into his position as technical manager in October 2002 and was not asked to sign the non-compete agreement.

In May 2004, Wausau again revised the Exhibit A List to the employment agreement, this time increasing the number of conflicting organizations to fifteen, but otherwise retaining the prohibition on employment with competing divisions within Glatfelter Papers. That list remains the operative Exhibit A at this time and would have been the list in effect at the time of Magda's resignation. There is no evidence that Magda was ever presented with the revised Exhibit A prior to the commencement of this litigation.

*Magda's Personal and Professional Circumstances Before and After His Employment at the Otis Mill*

David Magda received a Bachelor of Science Degree in Paper Science and Engineering from Syracuse University College of Environmental Science and Forestry in 1988. His first employer was National Starch and Chemical Company where he worked from 1988 until 1996 in the company's division that supplied starch to paper companies to use in the "wet end" of the papermaking business. He did technical, marketing and sales work for the company, developing contacts with paper mills throughout North America.

From 1996 until it went bankrupt in 2001, Magda worked for Crown Vantage Incorporated, a company that made specialty grades of paper. In 2001 Curtis Paper took over the Crown Vantage mill and Magda continued in his position, assuming even greater responsibilities within that organization. Curtis and Crown Vantage manufactured a number of specialty paper applications including the wax lined folder holding Celestial tea bags, the Kellog's cereal box liners, the release sheets of paper for Trident gum and Reese's peanut butter cups, microwave popcorn bags, pan liners for bakeries and other paper products. While at Curtis, Magda gained experience with deep color applications

such as a Tiffany box, a deep chocolate-colored liner for Oreo cookies, and a black box for a perfume company. In the Spring of 2003, Curtis gave its employees a 60–day warning that it intended to close the mill and terminate their employment.

When Magda received the 60–day warning he began looking for other employment. At the time, he knew of an opening with Glatfelter in York, Pennsylvania, but he did not pursue the interview opportunity. Instead he went to Otis Mill in response to contact he received through a recruiter named Peter Asquith. When he received the offer of employment from Wausau, Magda discussed it with his wife and they jointly decided that Magda would accept the offer and that they would move to Maine.

Prior to accepting Wausua's offer for employment in Jay, Maine, David Magda had spent his entire professional life living and working in New Jersey. He is married and has two young children. His wife's parents and his own parents live in New Jersey. Magda and his wife experienced difficulties during both of her successful pregnancies resulting in his wife's need for complete bed rest in the midst of the pregnancy and the early induction and premature birth of both children. Her very first pregnancy had ended in miscarriage. According to Magda's testimony, the children are generally healthy but do have some residual deficits as a result of the difficult circumstances of their births. Magda's son is currently scheduled for a hernia operation later this Spring that will be covered under Magda's current health insurance policy. Magda and his wife have considered having a third child, but his wife would need a great deal of family support in that situation and would need to be close to her family. They currently own a home and live in York, Pennsylva-

nia, approximately three hours from her parents' home in New Jersey.

Magda has been unable to find employment opportunities closer to the couple's New Jersey family than the Glatfelter plant in York. There was a possibility of a position with Finch Pride, an organization not listed on the non-compete Exhibit A, in upstate New York, but that position would place him even further from family. Magda's starting salary at Glatfelter was $86,400 per year with various benefits, including family health insurance. In accordance with the appropriate provision of the WausauPaper non-compete and confidentiality agreements Magda informed Glatfelter of the restrictions prior to accepting employment with them and has signed an employment agreement with Glatfelter that acknowledges the WausauPaper contract and prohibits Magda from violating any of its confidentiality terms. His current position at Glatfelter is Business Development Manager, a job that is primarily in sales and marketing although it is apparent from the nature of the specialty paper industry that a sales job necessarily overlaps a product development position. When a customer needs a specialty paper for a specific application the salesperson's knowledge of whether it can be done in a profitable way is crucial in terms of consummating any sale.

### The WausauPaper/David Magda Employment Relationship

After Emerson Brooks was appointed technical manager of the Otis Mill in October 2002 it became apparent to him that a product development manager was needed to perform some of the functions he had previously performed. He obtained company authorization to hire someone for that position in December 2002. When initial efforts did not produce any successful candidates, Wausau retained the services of Peter Asquith, a recruiter, to screen resumes and find a suitable prospect. On May 16, 2003, Magda and his wife came to Jay, Maine, to interview for the position. Wausau paid for both of the Magdas to come to Maine through Asquith's efforts. Magda and his wife had a cordial meeting with Emerson Brooks and his wife. Wausau's decision makers all felt that Magda's skills and prior employment made him ideally suited for the Wausau position. A written offer was extended to him on May 21, 2003.

Negotiations continued through Peter Asquith as Magda did not accept the first offer because he wanted four rather than three weeks of vacation and he wanted to commence employment on June 30 rather than on June 12. Wausau acceded to both of his demands and the written amended offer was signed by Magda on June 2, 2003. There was absolutely no discussion of the non-compete agreement. The employment offer clearly indicated that Magda would be employed as an at-will employee. Included among the benefits he would receive was approximately $40,000.00 in relocation expenses that Magda would have to repay to WausauPaper if he voluntarily terminated the employment relationship within the first year.

Preparatory to the move to Maine the Magdas turned over their home in New Jersey to a real estate brokerage house specializing in corporate executive relocation and purchased a new home in Winthrop, Maine, shortly thereafter. Prior to commencing work on June 30, Magda arranged to purchase the Maine home and expended about $20,000.00 in home repairs in anticipation of his family's arrival the end of July. Magda arrived at the Otis Mill on June 30, signed the normal documentation attendant to commencement of employment, and began his new job. The non-compete agreement was not presented on this date.

Steve Wilkins, the director of human resources at Otis Mill, was responsible for obtaining Magda's signature on the relevant employment documents. Through oversight on his part he neglected to present the non-compete agreement at the June 30 meeting. Based on his testimony, I presently believe it to be more likely than not that Wilkins' oversight was not part of any plan on the part of Wausau management to lure Magda to Maine without informing him of the non-compete clause. According to Wilkins, on or about July 29 he happened to come upon the earlier memos from Behrens and realized that he had not obtained Magda's signature on a form non-compete agreement. He called Magda to his office and presented the non-compete agreement to him. Wilkins testified that Magda voiced no objection to the clause and told Wilkins that he had not come to Maine to concern himself with such things and that he planned to make a career with WausauPaper.

Magda tells a somewhat different story about the non-compete agreement. Although he agrees that he did not express any dissatisfaction to Wilkins at the time, Magda now says that he would not have accepted the Otis Mill position if he had known of the non-compete agreement. In my view, whether he learned of it on June 30 or July 29 would have made no difference in Magda's course of action because by June 30 he had already committed himself to buying a new house in Winthrop and selling his New Jersey residence. Whether Magda would have taken the job had Wausau brought up the non-compete agreement at the time of the original interview and employment offer in mid-May is, of course, the great unknown in this case. Apparently, Wausau itself now recognizes that the non-compete agreement should have been addressed at the negotiation stage, because WausauPaper has updated its employment policies to ensure that non-compete agreements are addressed during future employment negotiations.

Magda's employment experience at Wausau by all accounts was extremely satisfying for both parties. Emerson Brooks began to see Magda as a potential replacement for him when he eventually retires from the mill. Magda had experience that made him a valuable employee to Wausau and by the same token Magda concedes that his employment at Wausau broadened his knowledge and allowed him to be involved with the development of novel technologies. Magda continued working at Otis Mill for approximately sixteen months, through November 4, 2004. However, Magda's wife was not happy in Maine and wanted to return to New Jersey to be closer to her family. In approximately August 2004, Magda came to realize that his wife did not want to spend another winter in Maine and he began earnestly looking for employment. He secured the position with Glatfleter to commence November 29, 2004. On November 4, 2004, at approximately 8:30 in the morning Magda sent via fax to Glatfleter his signed letter of acceptance. That afternoon at approximately 4:20 Magda submitted his letter of resignation to Emerson Brooks. Both Brooks and Wilkins questioned Magda about his plans and his reason for the sudden resignation when, in their opinion, Magda had been a successful and productive employee. Magda pointedly lied to them by saying that he planned to return to school, possibly to obtain an M.B.A., and that he had no immediate employment plans. Brooks was shocked by the resignation; he felt that he and Magda were friends and that there had been no performance issues during the course of his employment. Magda assured Brooks he was not dissatisfied with his job, but that his reason for leaving was entirely person-

al and related to his wife's desire to leave Maine. Wilkins subsequently learned of Magda's employ with Glatfelter serendipitously. One of the other employees at the mill gave Wilkins a phone number where Magda could be reached. Wilkins phoned the number and learned that it was Glatfelter's York, Pennsylvania, facility. After confirming that Magda had indeed become an employee of Glatfelter in a division that competes directly with Wausau, and after requesting that Magda voluntarily leave his position at Glatfelter, Wausau filed suit January 14, 2005, seeking to enforce the non-compete agreement in a solitary breach of contact claim.

### Discussion

In its motion for preliminary injunctive relief, WausauPaper requests that the court enjoin Magda from:

(1) continuing to breach the non-compete provision in his Employment Agreement with Wausau–Mosinee [WausauPaper] by working for P.H. Glatfelter Paper Corporation ("Glatfelter") or by working for any other "Conflicting Organization" as defined in the Employment Agreement until the non-compete expires on November 4, 2005;

(2) from use or disclosure of Wausau–Mosinee's [WausauPaper's] confidential information until November 4, 2006;

(3) from ever using or disclosing of Wausau–Mosinee's [WausauPaper's] trade secrets; and

(4) Until November 4, 2005, from marketing or selling products to Wausau–Mosinee's [WausauPaper's] customers or to potential customers with whom Wausau–Mosinee [WausauPaper] made substantial sales efforts.

(Motion for Preliminary Injunction, Docket No. 3, at 1–2.) Of these four demands, Magda's opposition papers address only the first, which is also consistent with the opposition he raised during the hearing on the pending motion Accordingly, I conclude that Magda has conceded to the entry of a preliminary injunction ordering him to comply with demands 2, 3 and 4, as set forth at the end of this memorandum of decision, with only a minor modification to demand 4.

 The purpose of a preliminary injunction, in most cases, is to maintain the status quo by preserving the movant's equitable rights pending a final disposition. *Mank v. Green,* 297 F.Supp.2d 297, 304 (D.Me.2003). In order for Wausau to obtain a preliminary injunction requiring Magda to immediately cease working for a competing business unit of Glatfelter, I must find that the following criteria are met:

(1) that WausauPaper has exhibited a likelihood of success on the merits (at most, a probability; at least, a substantial possibility);

(2) that WausauPaper will suffer irreparable injury if the injunction is not granted;

(3) that such injury outweighs any harm which granting the injunctive relief would inflict on Magda; and

(4) the effect (if any) of the court's ruling on the public interest.

*See Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 15 (1st Cir.1996); *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Bishop,* 839 F.Supp. 68, 70 (D.Me. 1993). Following this familiar flowchart, I begin my discussion with the likelihood that WausauPaper will prevail in its breach of contract action, "the main bearing wall" of the four-part test. *Ross–Simons of Warwick, Inc. v. Baccarat, Inc.,* 102 F.3d 12, 16 (1st Cir.1996).

### A. Likelihood of Success on the Merits

 The parties are in agreement that the question of whether the non-com-

pete agreement is enforceable is to be determined by reference to Maine law. Pursuant to Maine law "the reasonableness of a noncompetition covenant is a question of law that must be determined by the facts developed in each case as to its duration, geographic area, and the interests sought to be protected." *Brignull v. Albert,* 666 A.2d 82, 84 (Me.1995). There is no serious contention in this case that the non-compete agreement designed by WausauPaper is unreasonable by virtue of its duration or scope. Nor does the WausauPaper non-compete agreement seek to protect an illegitimate business interest. Although Maine law does not permit non-compete agreements designed solely to prevent business competition, *id.,* the purpose of the agreement at issue in this case is to preserve WausauPaper's trade secrets and other confidential information, including confidential product information, manufacturing processes and customer lists.

 The dispute concerns the manner or process by which the agreement came to be executed. Magda primarily contends that the agreement is unenforceable because it was not supported by adequate consideration, *i.e.,* because it was not presented to him until after he had already commenced employment with WausauPaper as an "at-will" employee and because WausauPaper offered him no additional benefit in return other than the illusory promise of continued employment. (Def. Obj., Docket No. 17, at 2–3, 8–13.) Alternatively, Magda argues that the non-compete agreement is unconscionable because

it was not presented to him until after he had sold his home and moved to Maine, at a time when he had no meaningful opportunity to reject the agreement or enter into negotiations over its scope. (*Id.* at 13–16.) I conclude that WausauPaper has demonstrated a likelihood of success on the merits of its contract claim.

In *Brignull,* the Law Court held that "continued employment ... during a three-year period constitutes consideration to support [a] noncompetition agreement." 666 A.2d at 84. In this case WausauPaper continued to employ Magda for more than a year following his execution of the non-compete agreement. Nevertheless, Magda maintains that his circumstance is distinguishable from that presented in *Brignull* because he was an at-will employee and the non-compete agreement was not presented to him until after he had commenced employment, whereas the defendant in *Brignull* had an employment contract with a one-year term and the non-compete agreement had been a part of his initial employment agreement. Although Maine law is unclear as to how this case should be decided, and persuasive precedent is varied in its treatment, I conclude that the Law Court would most likely hold that the execution of a written non-compete agreement by a preexisting, at-will employee constitutes a unilateral promise that will give rise to an enforceable contract where the employer continues to employ the at-will employee for a period in excess of one year from the date of execution of the non-compete agreement.[3]

---

3. I do not mean to suggest that the Law Court would require a one-year period of employment as a threshold, only that the period of continued employment in this case is adequate consideration for an otherwise reasonable covenant not to compete. I also observe that in the at-will employment context, the Law Court might well treat the employee's

voluntary execution of a non-compete agreement and continued performance of his or her job as acceptance of the employer's modified or "renewed" job offer. *See, e.g., Pine River State Bank v. Mettille,* 333 N.W.2d 622, 627 (Minn.1983) (holding that when the employee "retains employment with knowledge of new or changed conditions, the new or

■ As an alternative to the lack of consideration argument, Magda puts forth an argument that he was "lured to Maine under false pretenses" because WausauPaper "hid from him ... the requirement that he execute the [non-compete agreement] until after he sold his home in New Jersey and relocated his family to Maine." (Docket No. 17 at 13.) Magda also argues that "the execution [of the agreement] was secured under duress given the significant relocation penalty." (*Id.*)

■ In order for a contract provision to amount to an unenforceable contract of adhesion, there must exist "some element of 'overreaching' by a party who exploits a 'vastly unequal bargaining position.'" *Schroeder v. Rynel, Ltd.*, 1998 ME 259, ¶ 15, 720 A.2d 1164, 1167 (quoting *Dairy Farm Leasing Co., Inc. v. Hartley*, 395 A.2d 1135, 1139 n. 3 (Me.1978)). To be sure, the circumstances surrounding the timing of the presentation of the non-compete agreement to Magda are suggestive of both "overreaching" and "unequal bargaining position." At the time the agreement was presented to him, Magda's ability to refuse to execute it was compromised by virtue of his long-distance move to Maine. On the other hand, Steve Wilkins's testimony concerning the implementation of the non-compete policy tends to establish that WausauPaper did not "lure [Magda] to Maine under false pretenses." It also tends to establish that WausauPaper did not set out to purposefully deceive Magda or otherwise "exploit" the fact that Magda had moved a considerable distance in order to work for WausauPaper. To the contrary, the testimony I heard during the hearing on the preliminary injunction motion tended to favor a finding that the "issue" arose by virtue of administrative oversight or poor policy implementation on the part of WausauPaper, whose human resources personnel professed at the hearing to have learned from this case that there is a need for WausauPaper to address non-compete agreements at the negotiation stage with all future prospective hires to its specialty paper group. Were there evidence that David Magda is not the first WausauPaper employee to be placed in this predicament, I might well infer some scheme on the part of WausauPaper's management to purposefully create and then exploit an unequal bargaining position, but that is not the circumstance that was presented at the hearing. Moreover, the record reflects that Magda was a very desirable employee for whom WausauPaper was willing to modify its initial offer of employment. Although both parties agree that Magda had no choice but to sign the non-compete agreement, I am not persuaded at this juncture that there was no room for Magda to negotiate some manner of additional consideration for executing the agreement, over and above continued at-will employment. Indeed, WausauPaper had expended in excess of $40,000 relocating Magda to Maine.[4] I am inclined to think that they would have considered any reasonable request by Magda in relation to receiving additional value in exchange for executing the non-compete agreement. In any event, the present record reflects that Magda barely paused to give the matter serious consideration. Given the particular factual circum-

changed conditions may become a contractual obligation").

4. I reject Magda's suggestion that he was placed under duress because he would be forced to repay his relocation expenses if he refused to sign the non-compete agreement. Had he refused to sign, and had WausauPaper chosen to discharge Magda on that basis, then Magda would not have voluntarily terminated his employment and, thus, could not have been required to repay his relocation expenses.

stances of this case, it appears more likely than not to be the case that WausauPaper neither "overreached" nor "exploited" a vastly unequal bargaining position when it requested that Magda sign its otherwise reasonable non-compete agreement. At this stage of the proceeding, my impression of the law is that this likely absence of *subjective* bad faith on the part of Wausau-Paper makes it more likely than not that the contract is enforceable.

## B. Irreparable Harm

■ Based on the testimony of both John Katchko and David Magda, I am persuaded that Magda *could* divulge confidential information to Glatfelter that could compromise WausauPaper's competitive position in relation to Glatfelter. However, I am not persuaded that WausauPaper will suffer irreparable injury in the absence of an preliminary injunction precluding Magda from continuing to work in his current position with Glatfelter. The employment contract that Magda signed upon commencement of his employment with WausauPaper provides that for a two-year period the company's confidential information must be held in strict confidence regardless of employment, and that trade secrets will forever be held secret. This confidentiality requirement can be observed regardless of whether Magda continues to work at Glatfelter. According to

Magda's testimony, he has lived up to this promise and fully intends to honor it. Furthermore, Magda, in accordance with his contractual obligation, informed Glatfleter of the WausauPaper employment agreement at the time he commenced his employment and his current employer has acknowledged its acceptance of Magda's confidentiality obligations. According to WausauPaper, Magda has already breached the confidentiality agreement by virtue of representations he included in the resume he submitted in application for employment with Glatfelter. I am not now persuaded, based on the record developed during the preliminary hearing, that the information conveyed on Magda's resume divulged any of WausauPaper's confidential information. Prior to accepting employment with WausauPaper, Magda gained considerable experience in manufacturing specialty paper products,[5] including numerous categories of specialty products that he subsequently helped to manufacture at WausauPaper. At this stage of the proceedings, I am not persuaded that anything in the resume crossed the line between appropriately highlighting Magda's skills and inappropriately divulging, or inappropriately suggesting an ability or willingness to divulge, WausauPaper's confidential information.[6] Based on the testimony of

---

5. An employment reference provided by Steve Saari of WausauPaper states that Magda's "innovative skills" are "one of his biggest strengths. He has a knack or interest in innovative products [and] is not afraid to try new chemicals to meet the customer['s] needs." (Ex. 19 at D0031.) The evaluation also ranks Magda's technical skills as "excellent," observing that he has "[l]ots of experience with specialty products. He brought some broad experience to Wausau from Crown Vantage that has definitely been an asset." (*Id.*)

6. One of the most curious aspects of this case is the fact that most of the employees and all of the leadership working within WausauPaper's specialty papers group have never been required to sign non-compete agreements, despite considerable knowledge of, and long-term experience with, WausauPaper's allegedly unique processes and other confidential information. It has proved troubling to me that while WausauPaper argues that it will suffer irreparable injury if a 16–month employee is permitted to continue working for a competitor, WausauPaper has done nothing to restrict the ability of other, more senior

John Katchko, WausauPaper additionally maintains that it is not *possible* for Magda to perform his job as Glatfelter's business development manager, with responsibilities primarily in sales and marketing, without taking advantage of WausauPaper's confidential information gleaned while working in the production end of that operation. I do not accept this uncompromising and absolutist position. I conclude that the requested injunctive relief is not necessary to prevent irreparable injury to WausauPaper pending a final disposition of this case.

## C. Balance of Harms and Public Interest

██ On balance, I conclude that with the confidentiality provision in place, the injury that Magda and his family would suffer from an order that he discontinue his employment with Glatfelter would exceed any benefit that such an order would afford to WausauPaper. Magda is currently the sole breadwinner for his family of four.[7] His family is dependent on his salary and healthcare benefits for their well-being. His young son is facing corrective surgery for a hernia. His children are settled in a home in York, Pennsylvania, after living in two previous abodes. Glatfelter appears to be the only employer in Magda's specialty within a reasonable travel distance. These concerns are appreciable. I also conclude that, given the manner in which the non-compete agreement was first presented to Magda (a matter that WausauPaper well recognizes was poorly handled), the balance of the *equities* tips in the favor of Magda, notwithstanding the fact that Maine law would more likely than not favor the enforceability of the subject non-compete agreement. As for the public interest, where the circumstances surrounding the issuance of the preliminary injunction are so extremely fact specific to the two parties, I conclude that denial of preliminary injunctive relief would not cause any injury to the public interest.

## Conclusion

For the reasons set forth herein, WausauPaper's motion for preliminary injunctive relief (Docket No. 3) is **GRANTED, IN PART**, and **DENIED, IN PART**. It is hereby further **ORDERED** that defendant, David J. Magda, is **ENJOINED**:

(1) from using or disclosing the plaintiff's confidential information until November 4, 2006;

(2) from ever using or disclosing the plaintiff's trade secrets;

(3) from marketing or selling specialty paper products to the plaintiff's specialty paper products customers or potential specialty paper products customers with whom the plaintiff made substantial sales efforts during the period of Magda's employment with plaintiff; and

(4) from accepting any other employment from any entity listed on Exhibit A of the employment agreement other than his current position in the Sales & Marketing division at Glatfleter until November 4, 2005.

*So Ordered.*

---

employees to go to work for competitors or customers identified on exhibit A of the non-compete agreement. I can understand, perhaps, why WausauPaper would not want to "upset the applecart" with its most senior and trusted employees, but the evidence suggested that even those who had been at the mill a relatively short time prior to Magda's arrival were not asked to sign the non-compete agreement when this policy went into effect.

7. Magda's wife, although trained to teach, is not currently licensed or certified to teach in Pennsylvania.